**In re BEKER INDUSTRIES CORP., et al., Debtors.**

**BEKER INDUSTRIES CORP. and Beker Phosphate Corporation, as debtors in possession, Plaintiffs,**

v.

**FLORIDA LAND AND WATER ADJUDICATORY COMMISSION, Board of County Commissioners of Manatee County, Florida, Defendants.**

**Bankruptcy Nos. 85 B 11709, 85 B 11710, and 85–6825A.**

United States Bankruptcy Court, S.D. New York.

Feb. 6, 1986.

As Corrected Feb. 13, 1986.

See also, 55 B.R. 945.

612

Kronish, Lieb, Weiner & Hellman by Richard Lieb, Alan Levine, Karen M. Klein, Ingrid R. Sausjord, New York City, for the debtors in possession.

Stroock & Stroock & Lavan by Bonnie Schindel, New York City, for the Creditors Committee.

Bishop, Liberman & Cook by James M. Nolan, New York City, for Jessup & Lamont Capital Corp.

Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A. by Alan C. Sundberg, Russell S. Bogue, III, Nancy G. Linnan, Tallahassee, Fla., for Manatee County.

Wachtel, Lipton, Rosen & Katz by Scott Kenneth Charles, New York City, for the First Nat. Bank of Boston.

The Attorney General's Office for State of Fla., Dept. of Legal Affairs by David K. Miller, David G. Guest, Asst. Atty. Generals, Tallahassee, Fla., for Florida Land & Water Adjudicatory Com'n.

## DECISION

HOWARD C. BUSCHMAN, III, Bankruptcy Judge.

Beker Industries Corp. and Beker Phosphate Corporation (the "Debtors" or "Beker") seek a preliminary injunction preventing the continuation of an administrative proceeding (the "Proceeding") in Tallahassee, Florida. The Proceeding was scheduled to be heard on January 7, 1986 before the Florida Land and Water Adjudicatory

Commission (the "Commission") which is composed of the Governor of Florida and six other elected officials who make up the Cabinet. Beker further seeks a declaration that the Proceeding before the Commission is not exempted by 11 U.S.C. § 362(b)(4) (1978) from the automatic stay provided by § 362(a)(1). The Commission and Manatee County (the "County"), a political subdivision of the State of Florida governed by the Manatee County Board of County Commissioners, oppose the motion. In addition, the County has moved to dismiss the complaint for lack of subject matter jurisdiction or, alternatively, for this Court to abstain from hearing this proceeding.

## I

The Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101 *et. seq.* (1984) (the "Code") on October 21, 1985. They have continued in possession.

Beker Phosphate is a wholly owned subsidiary of Beker Industries and is licensed to do business in Florida. It owns and operates a mine located in Wingate Creek, Manatee County. The phosphate output of the Wingate Creek mine is shipped from a port facility operated by Beker in Port Manatee, Florida by ocean-going barge to the Beker Industries plant in Taft, Louisiana, where it is processed. The resultant high nutrient phosphate based fertilizer products are sold nationally and internationally.

The Wingate Creek mine operation began upon Beker's filing of an application for development approval ("ADA") pursuant to Fla.Stat. ch. 380 (Vernon's 1983) in October 1974, seeking Manatee County's approval of Beker's proposed mine development. The ADA (the "1974 ADA") was approved on January 28, 1975 upon issuance of a Development of Regional Impact Order ("DRI order")[1] by the Manatee County Board of Commissioners (the "Board"). The DRI order permitted Beker to mine up

to 3 million tons of phosphate rock per annum for 23 years. Thereafter, Beker invested over $80 million in land and facilities to acquire, develop and equip the Wingate Creek mine.

The 1974 ADA included a provision that a

> new railroad ... will be constructed to service this facility. All the product phosphate rock will be shipped by [railroad] to a Florida coast port, for water shipment to Beker factories in Louisiana and Illinois ... Alternatives to this rail system will be examined further, but the [railroad] system is expected to prevail ...

Soon after issuance of the DRI order, Beker submitted a progress report to the Tampa Bay Regional Planning Council ("TBRPC") and the County Board. Exhibit 3. The TBRPC is charged by statute, Fla. Stat. ch. 380, with review of all ADAs and its membership includes the County Commissioners. (Tr. at 77). That report, dated September 5, 1975, stated:

> The arrangements for the utilization of Port Manatee for shipping phosphate rock have not yet been completed. If a satisfactory agreement can be reached with the Port, it will not be feasible to utilize the railroad to transport Beker rock to the Port. Alternative methods of reaching the Port are being examined with trucking appearing to be the most viable alternative. Members of the Manatee Board of County Commissioners, the Manatee County Port Authority, Manatee County Highway Department, and the Manatee County Planning Department have been apprised of this alternative, with no objections to the principal being received or offered by them. No final decision on this subject has yet been made by Beker.

Shortly thereafter, Beker's expectation that the Seaboard Coastline Railway Company ("Seaboard") would construct the rail

---

**1.** Under Florida law, a development which "because of its character, magnitude, or location, would have a substantial effect upon the health, safety, or welfare of citizens of more than one county" is denominated a development of regional impact (DRI) requiring approval of an ADA. Fla.Stat. § 380.06(1).

line using its power of eminent domain was dashed. Seaboard merged with the Chessie system, a non-Florida company, and its power of eminent domain became questionable. (Tr. at p.75, 193).

The good faith reliance of Beker's management, particularly Beker Industries' vice chairman, Perry B. Duryea, on the discussions referred to in the progress report noted above and apparently others during the period from 1975–1980, and on having obtained use of a port facility from TBRPC to unload trucks, is undisputed. They believed that Beker had an understanding with the County that trucking of phosphate ore would be permitted. Thus was the mine developed and Beker, apparently on the advice of its attorneys, did not file an amended ADA until 1983 to reflect the understanding.

The mine opened in December 1981 and Beker commenced transporting phosphate by truck to Port Manatee on the west coast of Florida, some 32 miles from the Wingate Creek mine. The route commences at Florida State Road 64 which bisects the mine and proceeds west for 20 miles to Interstate Highway 75 and then north to Port Manatee, terminating at a facility utilized with the approval of the TBRPC in which Beker invested $1 million. (Tr. at 77–78). The mine produced 600,000 tons in 1982, and 900,000, 1,350,000 and 1,680,000 tons respectively in 1983, 1984 and 1985. (Tr. at 48–49). By April 1985, the Wingate Creek mine had reached the point of being able to supply the Taft facility completely without supplemental purchases of phosphate ore on the open market. (Tr. at 106–107). Current production has reached a level of

1.8 million tons annually, near its 2.0 million ton capacity. (Tr. at 101).

By 1981, after the election of new County Commissioners in 1980, the political climate had apparently changed with elections of commissioners opposed to phosphate mining. Shortly before Beker commenced operations, Manatee County and the State of Florida brought an action on September 1, 1981, seeking to enjoin Beker from proceeding with its Wingate Creek operations until Manatee County determined whether Beker's trucking operations constituted a "substantial deviation" from those contemplated in the DRI order approving the 1974 ADA. Beker responded on September 29, 1981, with an action seeking a Writ of Prohibition against the Board's attempt to stop Beker's operations through what Beker claimed was the unlawful means of a substantial deviation hearing. The Circuit Court of the Twelfth Judicial Circuit in and for Manatee County enjoined Beker from truck transportation westerly on State Road 64. (Tr. at 84).

Beker and Manatee County thereupon on February 26, 1982, entered into an agreement, which permitted Beker to transport its phosphate by truck, upon certain terms and conditions, to Port Manatee. It is unclear whether the agreement is still effective.[2]

Thereafter, on December 16, 1982, Manatee County adopted a resolution finding that Beker's proposal to truck its phosphate to Port Manatee constituted a "substantial deviation" from the DRI order. Exhibit 6. By this time, Beker's hope for rail transportation had largely vanished

---

2. That agreement provides, in pertinent part: Beker shall complete construction of the aforesaid railroad trackage no later than 22 months from the date hereof provided, however, that such 22-month period shall be extended to fully account for any period of time during which Beker is unable to proceed with the activities set forth in Subsections 1 through 3 of Subsection A of this Section II [including acquisition of the necessary right of way], or any other activities necessary for construction of railroad trackage, due to Acts of God. Further extension may be allowed if mutually agreed to by the parties hereto.

Exhibit 5. It appears from this record that it was subsequently determined that Beker could not obtain the power of eminent domain under Florida law necessary to obtain the necessary rights of way. What was contemplated by the parties in negotiating this clause and whether they mistakenly assumed that Beker could exercise such power is not contained in this record. Nor is it clear whether the force majeur language modifies only the second clause or both clauses.

due to the refusal by two prominent owners of land between the Wingate Creek mine and Port Manatee to permit Beker to obtain rights of way for a railway. Beker timely appealed the "substantial deviation" determination to the Commission but voluntarily dismissed its appeal in February 1983 to defuse the situation after being informed by the TBRPC that it would not consider a new ADA to cure the alleged deviation while an appeal was pending. (Tr. at 90–93). Beker, in March 1983, filed a new ADA (the "1983 ADA") requesting that the DRI order of January 28, 1975 be modified to add the following provisions:

Beker may ship phosphate rock from its mine by truck, west on State Road 64 to I–75, north on I–75 to US 301, west on US 301 to US 41, north on US 41 to Port Manatee (when I–275 is complete and operational the route shall be west on State Road 64 to I–75, north on I–75 to I–275, west on I–275 to US 41, north on US 41 to Port Manatee) and the return thereof on the same roads, or on a mutually acceptable alternative route.

Beker will not ship by truck to the Port or return such trucks to the mine during the hours Manatee County public school buses are normally scheduled to transport students to and from public schools. Beker shall limit its annual tonnage of phosphate rock shipped by truck from its mine to Port Manatee to 1.2 million tons.

The ADA also requested that trucking be permitted for the life of the mine or for 23 years, whichever should first occur.

Pursuant to Fla.Stat. § 380.06(1), the 1983 ADA was submitted before the TBRPC and Manatee County for review. On November 14, 1983, the TBRPC recommended denial of the continued transport of phosphate rock by truck after December 26, 1983, as proposed in the 1983 ADA. It asserted that the proposal would impact adversely on the capacity, structural integrity and safety of an eight mile section of State Road 64 that lies west of the Hardee County line. The TBRPC recommendation did, however, contain nine conditions which, if accepted by Beker, would mitigate the adverse impact to State Road 64 and permit continued trucking of phosphate ore. Beker accepted seven of the nine conditions. (Tr. at 96, 102).

Following review of the TBRPC's recommendation, Manatee County, on December 13, 1983, entered an order denying Beker's 1983 ADA. Tr. at 97. The order did not indicate the changes, if any, which would make the proposal eligible for approval, but it did permit Beker to continue trucking through December 26, 1983, in accordance with its interpretation of the parties' February 26, 1982 settlement agreement.

Beker timely appealed the County's denial of its 1983 ADA to the Commission and contemporaneously brought an action in Florida circuit court to enjoin Manatee County from taking any action to prohibit its shipment of phosphate ore by truck. Manatee County also instituted a suit in that court seeking injunctive relief. Exhibit 8. The circuit court on June 1, 1984, entered an interlocutory order granting Beker's request for injunctive relief permitting it to truck 1.5 million tons of phosphate ore annually until resolution of its appeal to the Commission and all appeals therefrom. In granting the injunction, the court balanced the equities, finding that Beker would be irreparably injured and that Beker's trucking of phosphate ore did not pose a threat to the health or safety of the public. (Exhibit 9).

For its part, the Commission forwarded Beker's appeal to the Division of Administrative Hearings and requested the assignment of a Hearing Officer to conduct a *de novo* hearing pursuant to Fla.Stat. § 120.-57(1) at which the local government findings are to be given no weight. After two weeks of hearings, the Hearing Officer, on August 27, 1985, filed a lengthy and detailed recommended order. He concluded that Beker's development proposal would have a neutral impact on all regional considerations including health and safety except for finding a favorable impact on local and state economy and an adverse impact on the eight mile portion of State Road 64. In addressing that adverse impact, the

Hearing Officer determined that curative measures proposed by Beker, including some of the conditions recommended by the TBRPC, were adequate. Among these was Beker's offer to pay some $800,000 toward improving State Road 64. Since Beker's trucks accounted for 44% of all trucking on State Road 64 and the sum of $800,000 exceeded 44% of the cost to restructure that road as estimated by engineers employed by the Florida Department of Transportation, the Hearing Officer found Beker's proposal was adequate to offset the adverse impact of its 1983 ADA on State Road 64. Accordingly, he recommended that the Commission approve Beker's 1983 ADA to truck up to 1.2 million tons of phosphate ore per annum from the Wingate Creek mine to Port Manatee at five-minute intervals, and to pay to the Florida Department of Transportation, the sum of $800,000, to restructure and upgrade State Road 64. At the hearing, he found irrelevant Beker's assertion that it had invested some $80 million upon the County's informal agreement to permit it to truck phosphate ore and denied Beker's motion to amend its 1983 ADA to permit shipment of 2.0 million tons annually.

Before the Hearing Officer's final recommendation was filed, Beker, in April 1985, sought and was granted a modification of the circuit court injunction permitting shipment of 2.0 million tons per year by truck at four-minute intervals, pending resolution of the administrative process. (Exhibit 10; Tr. at 106–107). From this order Manatee County appealed, thereby staying the injunction pursuant to Rule 9.310(b)(2), Florida Rules of Appellate Procedure. The circuit court, on December 24, 1985, vacated the stay, finding that Beker would suffer substantial hardship if the stay were not vacated and that no adverse impact would result if such relief were granted. (Exhibit 11). Manatee County has made a motion for reconsideration of that decision. (Tr. at 109–110).

A hearing before the Commission to consider the Hearing Officer's recommended order and the exceptions to it filed by Manatee County and Beker was scheduled for November 3, 1985. Upon Beker's filing its petitions under Chapter 11 of the Code on October 21, 1985, this Court issued a temporary restraining order, staying that hearing pending a hearing to be held on November 4, 1985 with respect to Beker's motion for a preliminary injunction. Beker, the Commission, and Manatee County thereupon entered into a stipulation agreeing that the hearing before the Commission would take place on December 5, 1985 and withdrawing Beker's motion for a preliminary injunction without prejudice.

Beker filed a Notice of Lack of Counsel with the Commission on December 4, 1985, alleging that Florida counsel had not yet been appointed and that no one was prepared to represent Beker the following day. The Commission thereby adjourned the hearing to January 7, 1986. On December 27, 1985, Beker made a motion to preliminarily enjoin the commencement of that hearing. The motion was heard by this Court on January 6, 1986. On January 7, 1986, the Commission at the request of this Court, agreed to reschedule the hearing until February 4, 1986, to enable this Court to address the numerous points advanced by the parties. At the further request of this Court, the hearing was adjourned to February 18, 1986.

At the hearing held before this Court, Erol Y. Beker, president and chief executive officer of Beker Industries, testified that curtailing the Wingate Creek mine production ability to 1.2 million tons a year would increase its unit cost per ton of the phosphate, and cause Beker to pay higher open market prices in order to provide the Taft plant with 2.0 million tons of phosphate annually. His conclusion was that it would not pay to operate Taft at this additional cost and that if the mine ceased operation, these Debtors could not reorganize. (Tr. at 36–41). Mr. Beker also testified that his attention to the Manatee litigation in the past four years had involved some 25% of his time, and predicted the same for 1986. He estimated the legal costs for 1986 in connection with these Proceedings at $500,000 by taking the aver-

age of $1,000,000 per year and halving it. (Tr. at 42–45).

This theory of impending armageddon, however, was limited by Mr. Duryea's factual testimony indicating that not until 1985 did the Wingate Creek mine operate at the level to satisfy the needs of the Taft plant. Thus, the Taft plant has operated in the past either below capacity or by supplementing its needs on the open market. Furthermore, Mr. Beker indicated that although 1.68 million tons was produced by the mine in 1985, some unquantified lesser amount was shipped (Tr. at 48). Whether that amount actually exceeded 1.5 million tons is not clear from this record. Moreover, the estimate of legal fees to be incurred in 1986 seems overly generous and speculative. Evidentiary hearings have ended unless, on appeal from the Commission, the state court remands the matter for additional evidence. It seems farfetched that appellate practice could be so costly, particularly where the fees are governed by the reasonableness standards of § 330 of the Code.

## II

A preliminary injunction may be issued in this Circuit only upon a showing of irreparable injury and either (i) probability of success on the merits or (ii) the presence of sufficiently serious questions going to the merits and that the balance of hardships tips decidedly in favor of the movant. *E.g.,* *Abdul Wali v. Coughlin,* 754 F.2d 1015, 1025–26 (2nd Cir.1984); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70 (2nd Cir.1979). Beker claims to have met this standard on the theory that the entire course of the Florida Proceedings constitutes an act against the Debtor and its property as contemplated by the automatic stay provided by §§ 362(a)(1) and (a)(3) of the Bankruptcy Code, and that the exception provided by § 362(b)(4) for the "continuation of an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power" is inapplicable.[3] It further asserts that those Proceedings, even if not covered by § 362(a), should be enjoined as posing a substantial threat to assets of these estates, will interfere with administration of these estates or reduce prospects for a successful reorganization and are brought in bad faith. (Debtors Memorandum at 16–25); (Tr. at 12–13, 229). In its complaint, Beker also claims that the County's efforts amount to an unconstitutional taking of its property and at the hearing observed that it would also contend that the County's actions amounted to an unconstitutional interference with interstate commerce (Tr. at 14). It added that those issues could be decided by this Court or by the Florida state courts on appeal from a decision by the Commission and were mentioned to show the possibility that Beker might not have to concern itself with com-

---

**3.** Section 362 states, in pertinent part:

(a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title ... operates as a stay, applicable to all entities, of—

(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the cases under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

(2) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title;

(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;

. . . .

(b) The filing of a petition under Section 301, 302, or 303 of this title ... does not operate as a stay—

. . . .

(4) under subsection (a)(1) of this section, of the commencement or continuation of an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power;

(5) under subsection (a)(2) of this section, of the enforcement of a judgment, other than a money judgment, obtained in an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power;

plying with the County's interpretation of its 1974 ADA in reorganizing itself. (Tr. at 13–14). The constitutional issues are thus not presently before us.[4]

In response, the County and Commission rely on the exemption provided by § 362(b)(4), assert that the Court is without jurisdiction to enjoin a state regulatory proceeding, claim that the standard for a preliminary injunction has not been met, and assert that this Court must abstain from entertaining the proceeding pursuant to 28 U.S.C. § 1334(c)(2) (1984). In a subsequent motion, the County moved to dismiss the complaint for lack of subject matter jurisdiction and alternatively sought mandatory abstension or permissive abstension pursuant to 28 U.S.C. § 1334(c)(1).

### III

■ The threshold issues of abstention and jurisdiction warrant only brief discussion for the County's assertions in this respect plainly lack merit. On its face, the mandatory abstention provided by 28 U.S.C. § 1334(c)(2) is inapplicable. That section states in full:

> Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction. Any decision to abstain made under this subsection is not reviewable by appeal or otherwise. This subsection shall not be construed to limit the applicability of the stay provided for by section 362 of title 11, United States Code, as such section applies to an action affecting the property of the estate in bankruptcy.

Aside from the last sentence and Beker's assertion that the Florida Proceedings are all directed at its mine, at the rights it obtained on approval of its 1974 ADA, and at the rights it obtained under its settlement with the County, this provision is inapplicable because Beker's complaint is not based in state law but rather on federal bankruptcy and constitutional provisions.[5]

■ The County's assertion that this Court should exercise its discretion under

---

**4.** In its opening brief, Beker referred to the taking issue (Debtors' Memorandum at 26–29) but did not fully brief the issue in the manner contemplated by Rule 3(b) of the Civil Rules of the United States District Court for the Southern District of New York. In its post hearing brief, served in response to the post hearing briefs of the County and Commission, Beker first briefed the Commerce Clause issue. This attempt to raise an issue for the first time in the last brief is neither proper nor contemplated by Rule 3(b). Both issues, moreover, especially the taking issue, may not be ripe for decision absent a decision by the Commission. *E.g., Abbott Laboratories Inc. v. Gardner,* 387 U.S. 136, 148–149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967); *Seafarers International Union of North America v. United States Coast Guard,* 736 F.2d 19, 26–27 (2d Cir.1984). For these reasons and for the reasons noted in the text, particularly the opening statement by counsel for Beker limiting the request for preliminary injunctive relief to the § 362 claim and the assertion of harm to the estate through detriment to its administration and protection of its assets, those issues are not addressed by us. Nor has any claim been made that the Florida statutes, as they apply to trucking phosphate on I–75, are preempted by federal legislation. *See United States v. State of Connecticut,* 566 F.Supp. 571, 576 (D.Conn.), *aff'd* 742 F.2d 1443 (2d Cir.1983).

**5.** In seeking abstention, the County principally relies on *In re Historic Lower Mill Associates,* 49 B.R. at 67–68, where the debtor sought an order enjoining a village from continuing a state court action to restrain the debtor from using real property without a required certificate of occupancy. In denying the motion the court held that the § 362(b)(5) exemption of enforcement of judgments obtained by a governmental unit to enforce its police or regulatory power from the automatic stay indicated the impropriety of such an injunction. It further relied on *In re Cousins Restaurants Inc.,* 11 B.R. 521, 8 B.C.D. 15, 4 C.B.C.2d 973 (Bankr.W.D.N.Y.1981) which precluded removal of such an action. In *dicta,* the court referred to 28 U.S.C. § 1334(c)(2). The relevance of that reference is not clear from the opinion unless the court was addressing a request to compel the village to bring its state court injunction proceeding before the bankruptcy court.

28 U.S.C. § 1334(c)(1) and abstain also can not be sustained. That section provides for discretionary abstension "in the interest of justice or in the interest of comity with state courts or respect for state law...." In urging abstention, the County apparently misconstrues Beker's complaint as putting in issue the questions before the Commission, and thus concerning state law. The complaint, however, does no such thing. It raises federal bankruptcy and constitutional issues against the backdrop of state law. Federal law provides the rule of decision. 28 U.S.C. § 1334(c)(1) is thus inapplicable.

For the same reason, abstention under general doctrines as articulated by the courts is also improper. Unlike *In re Gary Aircraft Corp.*, 698 F.2d 775 (5th Cir.), *cert. denied*, 464 U.S. 820, 104 S.Ct. 82, 78 L.Ed.2d 92 (1983), this case does not involve liquidation of a claim falling within an agency's special expertise. It calls for resolution of federal issues which the federal courts have an unflagging duty to address. *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976); *accord Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 103 S.Ct. 927, 935, 74 L.Ed.2d 765 (1983); *In re Martin-Trigona*, 35 B.R. 596, 600, 11 B.C.D. 357, 9 C.B.C.2d 958 (Bankr.S.D.N.Y.1983).

Since the relief sought, moreover, implicates a determination of the extent of the automatic stay, is based on the needs of estate administration, and concerns the validity of constraints on estate property, the proceeding before us is clearly a matter arising under the Bankruptcy Code, or arising in a case under the Bankruptcy Code. Thus it is within the jurisdiction of the district court as provided by 28 U.S.C. § 1334(b) and referred here pursuant to 28 U.S.C. § 157(a) by the order of the district court for this district entered on July 10, 1984. *E.g.*, *Carlton v. BAWW Inc.*, 751 F.2d 781, 787 (5th Cir.1985); *In re Baldwin-United Corporation Litigation*, 765 F.2d 343, 348 (2d Cir.1985); *In re Better Homes of Virginia Inc.*, 52 B.R. 426 (E.D. Va.1985); *Lesser v. A-Z Associates (In re Lion Capital Group)*, 48 B.R. 329 (S.D.N. Y.1985); *In re Datair Systems Corp.*, 37 B.R. 690, 697, 11 B.C.D. 1235, 10 C.B.C.2d 225 (Bankr.N.D.Ill.1983); *cf. Salomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574 (2d Cir.1983); *Martin-Trigona v. Brooks & Holtzman*, 551 F.Supp. 1378, 1381 (S.D.N. Y.1982). As such and because it concerns property of the estate, it is also a core proceeding. *In re Lion Capital Group Inc.*, 46 B.R. 850, 12 B.C.D. 840, 12 C.B. C.2d 59, CCH Bank.H.Rep. ¶ 70,250 (Bankr. S.D.N.Y.1985).

Furthermore, courts in bankruptcy have long had subject matter jurisdiction to issue injunctive relief to protect the administration of an estate and the opportunity to reorganize independent of the existance of a property interest. *Continental Illinois National Bank & Trust Co. v. Chicago, Rock Island & Pacific Ry. Co.*, 294 U.S. 648, 675–676, 55 S.Ct. 595, 605–606, 79 L.Ed. 1110 (1934). That ability is continued under 28 U.S.C. § 1334. *In re Baldwin-United Corporation Litigation*, 765 F.2d at 348; *National Labor Relations Board v. Superior Forwarding Inc.*, 762 F.2d 695, 698 (8th Cir.1985); *Lesser v. A-Z Associates (In re Lion Capital Group)*, 44 B.R. 690, 700–701 (Bankr.S.D.N.Y.1983) (limitation on injunctive relief under former Bankruptcy Act to protection of property held inapplicable under the Bankruptcy Code and jurisdictional grants).

Notwithstanding the nature of this proceeding as clearly set forth in Beker's complaint and consistent with its mistaken view that it solely involves consideration of the issues before the Commission, the County claims that this proceeding does not concern property of the estate and is thus without this Court's jurisdiction. That claim is without merit. 28 U.S.C. § 1334(b) is not so limited. Nor has it been so construed in the cases noted above.

Indeed, the premise on which the County's contention is based does not withstand scrutiny. In asserting that Beker's ability to truck phosphate ore from its mine is not

a property right, the County relies principally on *Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935, 942 (5th Cir.1983) and *D.H. Overmeyer Telecasting Co. v. Lake Erie Communications, Inc. (In re D.H. Overmeyer Telecasting Co.)*, 35 B.R. 400 (Bankr.N.D.Ohio 1983). *Braniff* held that Federal Aviation Administration rules limiting air carrier operation to landing slots do not create property rights. The *Telecasting* court held that a license issued by the Federal Communications Commission is not property or that if it is, it is property defined by and subject to F.C.C. rules.

Both of these cases failed to consider either the legislative history to § 541 of the Code which defines property of an estate or *United States v. Whiting Pools Inc.*, 462 U.S. 198, 204, 103 S.Ct. 2309, 2313, 76 L.Ed.2d 515 (1983), where the Supreme Court, upon examination of that history, observed that "Congress intended a broad range of property to be included in the estate." Following *Whiting Pools* and relying on it, the district court in *Bernstein v. B.C. Williams, Inc. (In re Rocky Mountain Trucking Co.)*, 47 B.R. 1020 (D.Colo. 1985) held that a state agency issued certificate of public convenience and necessity enabling a trucking firm to serve as a common carrier throughout the state is property of the estate, even though dormant pursuant to agency rules, and therefore consideration by the commission of post-petition failure to utilize the license was within the automatic stay provided by § 362(a)(3) of the Code. Other courts are in accord in holding similar permits to be property of an estate. *See e.g., In re Golden Plan of California, Inc.*, 37 B.R. 167 (Bankr.E.D.Cal.1983); *In re Hodges*, 33 B.R. 51 (Bankr.E.D.Pa.1983); *In re R.S. Pinellas Motel Partnership*, 2 B.R. 113, 5 B.C.D. 1292, 1 C.B.C.2d 349 (Bankr.M.D. Fla.1979).

■ These cases represent the better view. Nor does it appear that the *Braniff* court would disagree. There it was concerned with mere rules issued by a federal agency having exclusive jurisdiction and bearing no resemblance to the creation of a license or vested privilege. Here, the County's position is that Beker cannot use state and federal highways within the County absent a DRI permitting it to do so. County's Supplemental Memorandum at 16–17. Thus, a DRI, insofar as it is required to utilize roads, is effectively a license.

These cases, moreover, accord with *Garrity v. Goldstein (In re National Hospital & Institutional Builders Co.)*, 658 F.2d 39 (2d Cir.1981), *cert. denied*, 454 U.S. 1149, 102 S.Ct. 1014, 71 L.Ed.2d 303 (1982) where it was assumed that a certificate of occupancy, even though dormant pursuant to local ordinance, was property of the estate. To hold otherwise would be to rule, as the County says here, that a property interest subject to regulation, as nearly all are, or conditioned upon regulatory requirements, is not property of an estate. Such a ruling would contemplate that all licenses and permits issued by governmental units are not property of the estate even though the County concedes that they are.

Far more consistent with general Congressional intent as found by *Whiting Pools* is to construe such rights as within the definition of property of an estate, to recognize, as discussed *infra*, that valid regulation continues post-petition as provided in 28 U.S.C. § 959(b) (1978) and to apply the evident Congressional intent, reflected in §§ 362(b)(4) and (b)(5) of the Code, that good faith enforcement by governmental units of valid regulation is to be permitted to continue. Accordingly, both the premise and the conclusion urged by the County in asserting that this Court lacks jurisdiction over the subject matter of this adversary proceeding cannot be sustained. We thus turn to consideration of whether the elements requisite to a preliminary injunction have been shown.

IV

With respect to the claims that the proceeding before the Commission is embraced

by the automatic stay, Beker's motion in this regard is not cast in the form of a preliminary injunction but as a statutory injunction under § 105 of the Code. It, therefore, asserts that no irreparable injury need be shown since Congress has concluded that the acts enumerated in § 362(a) are to be stayed. The County and Commission do not claim otherwise.

Concerning interference with estate administration, one of the grounds alternatively argued by Beker, the courts have phrased the required showing not in terms of irreparable injury, but in the closely related terms of clearly defined prejudice to bankruptcy process or to the ability of those charged with estate administration to perform their tasks. *In re Lion Capital Group Inc.*, 44 B.R. 690, 703, (Bankr.S.D. N.Y.1984); *In re Johns-Manville Corp.*, 26 B.R. 420, 426–429 (Bankr.S.D.N.Y. 1983); *In re Wickes Companies*, No. LA 82–06633–35, 06655–65, slip op. (Bankr.C.D. Cal. Aug. 5, 1982) (unreported).

As to the other alternative ground, a threat to property of the estate, no cases have been called to our attention, nor have we been able to find any discussing the standard for a preliminary injunction, as Beker seeks here, as opposed to an injunction for the life of the bankruptcy proceeding. Perhaps that is so because the grounds for injunctive relief in the latter instance require proof of harm, *e.g.*, *Superior Forwarding*, 762 F.2d at 699, and the removal of property from an estate irreparably injures it.

Neither has been shown here. There is no indication that the Commission Proceeding currently poses a threat to Beker's property. Its mine and plants remain property of these estates. By virtue of the order of the Florida circuit court dated June 1, 1984, Beker's ability to ship 1.5 million tons of phospate ore annually by truck will not be terminated by virtue of a decision by the Commission in the Proceeding pending before it. The County has sought rehearing of the December 1985 order permitting Beker to ship up to 2.0 million tons annually. But Beker does not now ship that amount. It will retain its ability to truck phosphate at or near current levels through the pendency of the appeals, even if the Commission's decision was unfavorable, and Beker affirms that it will appeal if the County prevails or if the Hearing Officer's report is accepted as is. Both Beker and the County estimate that the appeals will take at least several months. The concept of irreparable injury connotes immediate harm. *E.g., Walsh v. Local Board No. 10*, 305 F.Supp. 1274, 1277 (S.D.N.Y.1969). That immediacy is lacking here.

Furthermore, Beker is not injured in a legally cognizable way by having to comply with valid state statutes not enforced with bad faith. The reorganization process is designed to afford debtors with the opportunity to compose their debts and to reorganize themselves in order to continue in business. It is not designed to displace valid state and local statutes that do not conflict with the Bankruptcy Code. *See Midlantic National Bank v. New Jersey Department of Environmental Protection*, —— U.S. ——, ——, 106 S.Ct. 755, 760, 88 L.Ed.2d 859 (1986); *Palmer v. Webster & Atlas Nat'l Bank of Boston*, 312 U.S. 156, 163, 61 S.Ct. 542, 545, 85 L.Ed. 642 (1941); *In re Stable Mews Associates, Inc.*, 41 B.R. 594, 598–99, 11 C.B.C.2d 20 (Bankr. S.D.N.Y.1984); *cf. Duffey v. Dollison*, 734 F.2d 265, 273 (6th Cir.1984).

To Beker, ultimately being required to limit its annual trucking of phosphate ore at 1.2 million tons, substantially below the 1.68 million tons that it produced in 1985, will adversely impact its cost per ton for processing the ore. On that basis, it claims a need for injunctive relief to enable it to reorganize, and entitlement to such relief pursuant to § 105(a) of the Code which enables the court to "issue any order ... necessary or appropriate to carry out the provisions of this title."

There is nothing in the Bankruptcy Code, however, that protects a debtor in that regard. Notwithstanding the desire for calm seas leeward of the rocks of regu-

lation and for full sails, the Code does not change the business and regulatory environment in which a debtor operates. A debtor in possession under Chapter 11 is not *pro tanto* excused by virtue of its bankruptcy from complying with valid and enforceable state and local regulation. By virtue of 28 U.S.C. § 959(b), it is required to obey them. *E.g., Matter of Kennise Diversified Corp.*, 34 B.R. 237, 243, 11 B.C.D. 189, 9 C.B.C.2d 778 (Bankr.S.D.N.Y. 1983). Nothing in *Continental Illinois, National Bank & Trust Co. v. Chicago, Rock Island & Pacific Ry. Co.*, indicates, as Beker claims (Post Hearing Memorandum at 64), that § 105 is to be used to bring about a change in the regulatory environment. There the Supreme Court upheld the ability of courts in bankruptcy to enjoin the sale of collateral by a secured creditor. 294 U.S. at 675, 55 S.Ct. at 605. The import of 28 U.S.C. § 959(b) so confirms. *Midlantic,* —— U.S. at ——, 106 S.Ct. at 760. An ongoing business is not to be given a competitive edge merely by virtue of its attempt to reorganize under Chapter 11. *Palmer,* 312 U.S. at 163, 61 S.Ct. at 545; *Stable Mews,* 41 B.R. at 548–9. Section 105 is thus designed to enable the court to carry out the provisions of the Code in instances such as in *Continental* where collateral is necessary to the reorganization or as in *Palmer* where enforcement of a state statute would have preferred the creditors of a lessor railroad in reorganization over the creditors of a lessee railroad, also in reorganization.

■ Nor is there any likelihood of prejudice to estate administration. While these cases, in the three months since their commencement, have been fraught with considerable controversy and Beker's commercial standing is shaky, *In re Beker Industries, Inc.,* 55 B.R. 945, 951 (Bankr.S.D.N.Y.1985), the principal task of management, as evidenced on this record, currently lies in securing permanent financing by January 31, 1986 when its current financing expires. Moreover, the in-depth involvement in the hearings in Florida by senior management having responsibility for negotiating with cred-

itors and perhaps recapitalizing Beker or restructuring it through sale of some assets, has largely ended. The hearing on February 18 and the appeals thereafter will be on the basis of the record established before the Hearing Officer. It may be that senior management, as a result of the Commission's forthcoming decision, may be required to engage in considerable revision of business plans and identify alternative directions in order to come to terms with Beker's bankruptcy and the need to contain the cost of phosphate ore processed at the plant in Taft, Louisiana. But their task is a far cry from the situations in *Lion Capital,* 44 B.R. at 702–703, and *Johns-Manville,* 26 B.R. at 436. There, the demands on the trustee and senior management would have diverted those fiduciaries from performing exactly such reorganization tasks.

It is plainly apparent that Beker must address the constraints of state and local regulation in Florida, and that the validity of those constraints must be determined before these estates can be reorganized. It recognizes that obligation in seeking injunctive relief only through confirmation. (Tr. at 13). Indeed, one would think that a degree of certainty in this highly significant facet of its commercial existance would be needed before it could undertake negotiation of a stand-alone plan with its creditors and shareholders. Other than the need to resolve its financing before the Commission hearing, no reason has been articulated on this record indicating why this problem should not be addressed with knowledge of the Commission decision.

### V

Nor has Beker shown a probability of success on its claim that the Florida Proceeding is subject to the automatic stay or that an injunction is necessary to protect estate property or estate administration.

### A.

In attempting to show probability of success on its claim that the exemption codi-

fied in § 362(b)(4) is inapplicable, Beker makes three principal assertions. It first states that the stay can be sustained under § 362(a)(3) and thus the exemption provided by § 362(b)(4) is inapplicable. The latter section, by its terms, exempts enforcement of police and regulatory powers only from § 362(a)(1). Secondly, relying on *National Hospital*, 658 F.2d at 43, it claims that the various proceedings in Florida indicate that the County is proceeding in bad faith before the Commission and thus is not within the exception. It also argues that bad faith and illegal discriminatory treatment is indicated by the County's failure to impose the same requirements of other truck shippers utilizing State Road 64. Beker further contends that the exemption is unavailable absent a showing of an urgent threat to health, safety and welfare if it conflicts with the bankruptcy court's control of property of the Debtors, citing *In re State of Missouri v. United States Bankruptcy Court for the E.D. of Arkansas*, 647 F.2d 768 (8th Cir.1981), *cert. denied*, 454 U.S. 1162, 102 S.Ct. 1035, 71 L.Ed.2d 318 (1982). As set forth below, these assertions are either factually inapposite or do not withstand analysis.[6]

■ As to the first assertion, § 362(a)(3) stays "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." Although Beker contends that the effect of the Florida Proceeding will be to "render Beker's Wingate mine unable to effectively or economically operate" and "to hamper the operation of its Taft, Louisiana plant and [t]hus these two significant assets of these estates would for practical purposes be taken from it"

(Debtor's Post Hearing Memorandum at 15), it cannot be gainsaid that the Florida Proceeding does not seek a change in possession of either of those properties. Nor can it be said that the Florida Proceeding concerns possession of whatever property right or privilege Beker may have obtained in the 1975 DRI order. That order, as Beker notes, *id.* pp. 621–22, conferred an ability to operate the Wingate Creek mine with the transportation issue left in the seemingly uncertain status noted above. To be sure, as discussed above, *supra* p. 622, licenses are to be considered property of an estate. But Beker's claim of a right to truck based on the pre–1981 informal acceptance by the County of its need to ship by truck, the involvement by County Commissioners in the port facility and its having spent $80 million in reliance thereon, lies in the nature of an estoppel, not in a property right or license.

The question presented by Beker's reliance on § 362(a)(3) is thus whether the Florida Proceeding is an act "to exercise control over property of the estate" as that section provides. In addressing that issue we write on a clean slate. The phrase was added by the Bankruptcy and Federal Judgeship Act of 1984, P.L. 98–353 (1984). No cases construing it in the context of state and local regulation have been called to our attention[7]; nor has any legislative history on this point been cited to us.

■ The automatic stay is fundamental to the reorganization process; it is not to be lightly dismissed. *Marine Midland Bank, N.A. v. Saypol (In re Saypol)*, 31 B.R. 796, 799, 10 B.C.D. 1057 (Bankr.S.D. N.Y.1983). But its assertion can often conflict with other pressing public policies,

---

**6.** The County and Commission assert that since the instant Proceeding before the Commission was not brought against Beker but initiated by it with the filing of the 1983 ADA, it is not subject to the automatic stay which bars only acts against the debtor or its property. Beker, relying on *Association of St. Croix Condominium Owners v. St. Croix Hotel Corporation*, 682 F.2d 446 (3d Cir.1982), asserts that the issue is not to be viewed in isolation but in the context of the entire dispute initiated by the County's commencement of legal proceedings in 1981. We

see no need to resolve this issue in view of our holding, *infra*, that the exemption applies.

**7.** This issue was not discussed in *In re Rocky Mountains Trucking Co.* There the state agency attempted to forfeit a license. Since the underlying bankruptcy case commenced before the effective date of the 1984 amendment to § 362(a)(3), only the obtaining of property or possession provisions applied. *See* 47 B.R. at 1021.

particularly the valid enforcement of police and regulatory power by governmental units. Congress addressed the balance of these interests in §§ 362(b)(4) and (b)(5) of the Code. The question raised here is whether a similar balance of those policies lies under the "control" provision of § 362(a)(3). We conclude that it does.

In asserting coverage by § 362(a)(3) on a control theory, Beker contends that by regulating transport from the mine, the County and the Commission are exerting control over it. (Post Hearing Memorandum at 16). This argument has appeal only if by employing the term "control", Congress sought to include state and local regulation, as opposed to the limitation on the § 362(b)(4) exemption applicable to the automatic stay of acts against a debtor, such as state attempts to enforce state distribution schemes with respect to property of the estate, as in *In re State of Missouri,* or governmental acts to establish or protect a pecuniary interest in estate property as stated in *In re Lawson Burich Associates, Inc.,* 31 B.R. 604, 611, 9 C.B.C.2d 676 (S.D. N.Y.1983). There is no evidence that Congress sought such coverage and we hesitate to suggest any such intention. To have done so through enacting the phrase and concomitantly failing to have amended § 362(b)(4) to exempt good faith exercise of police and regulatory power from § 362(a)(3) would have legislatively overruled the numerous cases exempting such governmental acts from the automatic stay, both under the Code, *e.g., Penn Terra Limited v. Department of Environmental Resources, Commonwealth of Pennsylvania,* 733 F.2d 267 (3d Cir.1984) and the former Bankruptcy Act, *National Hospital, supra.* The least one could expect, in that circumstance and in light of the strong Congressional intention in 1978 to provide for such exemption, S.Rep. No. 95–989, 95th Cong., 2d Sess. 51, 52, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5838; H.Rep. No. 95–595, 95th Cong., 2d Sess. 343, 343, *reprinted in,* 1978 Code Cong. & Ad.News 5963, 6299, would be a clear expression of intent to effect such a reversal. *Midlantic,* —— U.S. at ——, 106 S.Ct. at 759.

■ Furthermore, the legislative history to § 362(a)(3), when enacted as part of the Bankruptcy Reform Act of 1978, P.L. 95–598, reveals that this branch of the automatic stay "applies to prevent dismemberment of the estate and to assure its orderly distribution." *Securities and Exch. Comm. v. First Fin. Group of Tex.,* 645 F.2d 429, 439 (5th Cir.1981); *cf. In re Lawson Burich Associates,* 31 B.R. at 609–10. Since an act designed to change control of property could be tantamount to obtaining possession and have the same effect, it appears that § 362(a)(3) was merely tightened to obtain full protection, rather than to overrule the cases delineating the scope of the § 362(b)(4) exemption, and thereby straight-jacket regulation of the use of property by governmental units. To be sure, § 362 is not so worded on its face. But, as Judge Learned Hand observed, there is no "surer mark of oversolicitude for the letter [of the wording of a statute] than to wince at carrying out [its] purposes because the words used do not formally match with it." *Federal Deposit Inc. Corp. v. Tremaine,* 133 F.2d 827, 830 (2d Cir.1943). We thus hold that the scope of the control provision of § 362(a)(3), as applicable to governmental regulation, is governed by the contours of § 362(b)(4) as developed by case authority.

As to that exemption itself, the bad faith rule set forth in *National Hospital* is plainly inapplicable here. In *National Hospital,* a case under the former Bankruptcy Act (the "Act"), the Second Circuit reasoned that the commencement by a city of a proceeding to revoke a debtor's certificate of occupancy was embraced by the automatic stay provided by former Rule 12–43 of the Bankruptcy Rules of Procedure and that good cause for relief from the stay would "include proof that the revocation was being sought in good faith under state and federal law." 658 F.2d at 42. Given this Court's finding that the revocation was sought at the request of neighborhood groups only because the

trustee sought to sell the debtor's nursing home facility to a Hassidic Jewish organization, the Second Circuit reversed the district court's voiding of the injunction issued to enforce the stay and remanded for determination of whether the action was taken in bad faith.

In so holding, the court rejected the city's reliance on the failure of Congress to include in § 362(b)(4) bad faith enforcement of police and regulatory power. It observed that the former Act, not the Code, governed the case and that, in any event Congress, in adopting the Code, and presumably 11 U.S.C. § 105, "did not eliminate the bankruptcy court's power to enjoin the enforcement of local regulation which is shown to be used in bad faith." 658 F.2d at 43.

■■■ Were this implication that bad faith enforcement is excluded from the automatic stay the holding of the court, our inquiry on this point would end. But from the statutory context and the legislative history indicating that the exception is to be read narrowly, S.Rep. No. 95–989 at 52, 1978 U.S.Code Cong. & Ad.News at 5787, 5838; H.Rep. No. 95–595 at 343, 1978 U.S. Code Cong. & Ad.News at 6299; *see also In re State of Missouri*, 647 F.2d at 776, it would appear that bad faith regulation is not so exempted. Section 362(b)(4), in its qualification "to enforce such governmental unit's police or regulatory power," apparently excludes actions or proceedings brought for an ulterior motive and thus in bad faith. We see no reason, moreover, why Congress would exempt bad faith regulation from the automatic stay and thereby make a debtor's preliminary freedom from it subject to a showing of injury. Absent an automatic stay, "a city interested in the outcome of a bankruptcy petition could seriously interfere with management of the bankrupt estate through repeated threats of harmful rezoning," *National Hospital*, 658 F.2d at 43, short of causing the injury warranting an injunction. Indeed, the district court for this district has effectively adopted that approach by engrafting the *National Hospital* reasoning

on to the § 362(b)(4) exemption. *See In re Lawson Burich Associates*, 31 B.R. at 610; *accord In re Farmers & Ranchers Livestock-Auction, Inc.*, 46 B.R. 781 (Bankr.E. D.Ark.1984).

■■■ That is not to say, however, that Congress envisioned litigation of this nature to always be turned into an inquiry of the good faith of state and local officials. Such should be presumed, only to be rebutted by particularized pleadings made after investigation as required by Rule 9011 of the Rules of Bankruptcy Procedure and proof of the various forms of bad faith set forth in *National Hospital*. Of those forms, the ones assertedly applicable here concern an alleged desire to harass, ill will or other improper motivation. Such is said by Beker to lie in the commencement of the County's litigation by commissioners opposed to phosphate mining, the only indications of which are the determination of one commissioner to appeal from any Commission decision unfavorable to the County, and that commissioners elected in 1980 apparently campaigned on an "anti-phosphate" platform. Bad faith, however, is to be distinguished from concern for the well-being of constituents, the local environment and the appropriate usages of land. Concern for the types of people who would live or conduct business in a community is similarly to be distinguished from the political desirability of a particular industry and the general effects it may have on the community. *Cf. City of Cleburne, Texas v. Cleburne Living Center, Inc.,* —— U.S. ——, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).

This distinction Beker attempts to rebut by asserting that the County could not be concerned for the safety of its citizenry passing on State Road 64 in the company of Beker trucks since the Florida state court and the Hearing Officer stated that those trucks did not pose a safety hazard. There is nothing that shows that the County's concern was mere pretext or otherwise made in bad faith. There is, moreover, an indication of the County's concern for the highway since the Florida Department of Transportation engineers have prepared, as

found by the Hearing Officer, an estimate to upgrade State Road 64, and Beker has agreed to pay $800,000 to that end.[8]

Nor is bad faith sustained by the evidence, such as it is, that restraints similar to those the County would impose on Beker have not been imposed on other shippers by truck. There is no indication that the other truckers were subject to County regulation or were required to file an ADA. Reasonable exercise of discretion in law enforcement is not, contrary to Beker's assertion, a denial of equal protection. It rises to the level of a constitutional violation when, while others similarly situated to the defendant are not generally prosecuted, the discretion is intentionally discriminatory and is based on an arbitrary or invidious classification. *Yick-Wo v. Hopkins*, 118 U.S. 356, 372–373, 6 S.Ct. 1064, 1072, 30 L.Ed. 220 (1886); Annot., 45 A.L.R.Fed. 732,737 (1979).[9] Absent these considerations, discretion in enforcement is an accepted and integral part of the administration of law. Weissman, Andrew B., *The Discriminatory Application of Penal Laws By State Judicial and Quasi-Judicial Officers: Playing the Shell Game of Rights and Remedies*, 69 Nw.U.L.Rev. 489, 496 (1974); 45 A.L.R.Fed. at 738.

**B.**

Of more substance is Beker's assertion that, because the Florida circuit court and the Hearing Officer found the Beker trucks not to present a safety concern, the § 362(b)(4) exemption is inapplicable on the ground that it is limited to only those cases actually involving governmental actions to protect public health and safety. This contention raises the issue whether a state land use planning statute, as the Florida statute unquestionably is, (Tr. at 59), constitutes police or regulatory power within the meaning of § 362(b)(4).

In the analysis of that issue, it is settled that this narrow exception referring to police or regulatory power applies to the "enforcement of state laws affecting health, welfare, morals and safety but not [to] regulatory laws that directly conflict with the control of res or property by the bankruptcy court," *In re State of Missouri*, 647 F.2d at 776, or to "actions by a governmental unit to protect a pecuniary interest in property of the debtor or property of the estate." *In re Lawson Burich Associates*, 31 B.R. at 611; 124 Cong. Rec.H. 11089, *reprinted in* 1978 U.S.Code Cong. & Ad.News 6436, 6444–45 (statement of Rep. Edwards). The difficulty comes in

**8.** Beker claims that the County is barred by collateral estoppel from claiming a concern for safety on the basis of findings by the Florida circuit court in issuing its preliminary injunction in June 1984 and amending it in August 1985. This doctrine is inapplicable. Under the doctrine of collateral estoppel, or issue preclusion, a judgment, once rendered by a court of competent jurisdiction, will be treated thereafter as the "full measure of relief to be accorded between the same parties on the same ... 'cause of action.'" *Murphy v. Gallagher*, 761 F.2d 878, 881–882 (2d Cir.1985) (citing *Kaspar Wire Works, Inc. v. Leco Engineering & Machine, Inc.*, 575 F.2d 530, 535 (5th Cir.1978)). As such, its application requires the existence of a valid and final judgment and that the issue actually have been litigated. *Ibid; In the Matter of Esposito*, 44 B.R. 817, 823 (Bankr.S.D.N.Y.1984); *accord Mobil Oil Corp. v. Shevin*, 354 So.2d 372, 374 (Fla.1917) (Florida law); *Schwartz v. Public Administrator*, 24 N.Y.2d 65, 71, 298 N.Y.S.2d 955, 246 N.E.2d 725 (1969) (New York law).

A preliminary injunction, however, is not a final judgment nor a disposition of the matter on the merits. An evidentiary hearing on such a motion, absent consolidation pursuant to the Federal Rules of Civil Procedure 65(c), is not a trial on the merits. A preliminary injunction is issued only for the narrow purpose of preserving a court's power to render a meaningful decision after trial on the merits. *Chappell & Co. v. Frankel*, 367 F.2d 197, 202 (2d Cir.1966) (*dictum*); *University of Texas v. Comenish*, 451 U.S. 390, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981); *Penn v. San Juan Hospital, Inc.*, 528 F.2d 1181, 1185 (10th Cir.1975); *United States v. School District of Omaha, State of Nebraska*, 367 F.Supp. 179 (D.C.Neb.1973). Judge Hodges so recognized this distinction in fashioning the relief granted to Beker. Exhibit 9 at 19.

**9.** While Beker did not press the issues of constitutional taking and interference with interstate commerce clauses on this motion, it did, relying on *Yick Wo*, assert illegal discrimination as indicative of bad faith. That issue, unlike Beker's primary constitutional claims, is before us on this motion.

applying the exemption to governmental action regulating the debtor's conduct within these pole stars. *Compare e.g., Penn Terra Limited,* 733 F.2d at 278 (proceeding to enjoin operation of debtor's mining property from violating state environmental laws and to require debtor to seal mine in accord with pre-bankruptcy consent order within exception); *Ahrens Aircraft, Inc. v. National Labor Relations Board,* 703 F.2d 23, 24 (1st Cir.1983) (administrative unfair labor practice proceeding held within exception as exercise of regulatory power exemption); *National Labor Relations Board v. Evans Plumbing Co.,* 639 F.2d 291 (5th Cir.1981) *(idem); LaCoquille Investment Company, Inc. v. Town of Manalapan (In re LaCoquille Investment Company, Inc.),* 44 B.R. 731, 12 B.C.D. 822 (Bankr.S.D.Fla.1984) (change in zoning ordinance adversely affecting debtor within exception); *Arthur J. Cournoyer v. Town of Lincoln (In re Arthur J. Cournoyer),* 43 B.R. 354, 12 B.C.D. 430 (Bankr.D.R.I. 1984) (proceeding to enforce zoning ordinance retraining operation of truck parts junk yard in area zoned for residential use within exception); *In re Historic Lower Mill Associates,* 49 B.R. 66, 67, 13 B.C.D. 105 (Bankr.W.D.N.Y.1985) (proceeding to enjoin debtor from using premises without required certificate of occupancy within exemption) *with In the Matter of I.D.H. Realty Inc.,* 16 B.R. 55, 8 B.C.D. 512, 5 C.B. C.2d 1390 (Bankr.E.D.N.Y.1981) (proceeding to revoke certificate of occupancy of restaurant where zoning laws amended to provide that use of premises for same became non-conforming use and that cessation of operation for six months deemed abandonment of right to operate as a nonconforming use held not within exemption); *In re King Memorial Hospital, Inc.,* 4 B.R. 704, 6 B.C.D. 634, 2 C.B.C.2d 639 (Bankr.S.D.Fla.1980) (proceeding to declare certificate of need forfeited held not within exception as it was not a proceeding to enforce a statute designed to protect health and welfare but to assist community planning); *In re Island Club Marina, Ltd.,* 38 B.R. 847 (Bankr.N.D.Ill.1984) (proceeding to revoke building permits in light of re- zoning not within exception where under Florida law debtor gained property rights in said permits upon improvement of property).

■ These cases do not admit of easy classification. The justification advanced by the *In re King Memorial Hospital, Inc.* and *I.D.H. Realty* courts that the regulatory statutes do not embrace public health and safety cannot be squared with the *Ahrens Aircraft* and *Evans Garage* courts' construction of the exemption to embrace an unfair labor practice proceeding before the N.L.R.B. There was no indication in those decisions that the unfair labor practices there alleged involved a threat to health or safety. In reconciling these cases, it appears that *In re King Memorial Hospital, I.D.H. Realty,* and *National Hospital* are to be viewed as proceedings to revoke or declare forfeited the equivalent of licenses and therefore more properly classified, like the proceeding in *In re Rocky Mountain Transport,* as actions against property of the estate rather than actions concerning regulation of use of property. The latter are exempted from the automatic stay under § 362(b)(4).

■ In drawing that line on a case-by-case basis, the court, as in *Lawson Burich,* is to focus its attention on the statutory base for the regulatory action and the relief sought in the proceeding before the local or state tribunal. There is not the slightest indication that Congress sought to expand proceedings concerning the exemption into an inquiry as to whether the debtor's actions substantially threaten public safety, as Beker asserts here. Statements by the *State of Missouri* and *I.D.H. Realty* courts that public safety was not involved in those cases are employed in characterizing the state statutes and local ordinances before those courts rather than reflecting a factual inquiry concerning the need for the governmental unit to proceed. To the extent that the *In re King Memorial Hospital* court made such an inquiry in finding an absence of concern for the health of residents of the debtor's hospital, it is not followed here. To hold such hearings

would put the bankruptcy courts in the position of not merely assessing whether the governmental unit is proceeding in bad faith, but in the untenable position of second guessing the *good faith* judgment of state and local officials charged with enforcing state and local regulation. Questions as to whether there is a need for state or local regulatory intervention should be left, absent challenge to it on federal grounds, to the courts and administrative bodies established to address that issue.[10] Such is the impact of § 362(b)(4).[11]

Here, the relevant statute, Fla.Stat. ch. 380, is admitted by Beker to be a land use planning statute (Debtor's Post Hearing Memorandum at 31) and an exercise of the state's police power (Debtors' Motion at 30). A regulated "development" is defined to include a mining operation. Fla.Stat. § 380.04. Guidelines for consideration of whether a development has regional impact, and approval is thus required, must include not only consideration of the site to be developed but also off-site effects such as air pollution and "the amount of pedestrian or vehicular traffic likely to be generated." Fla.Stat. § 380.06. Prior to consideration of an ADA by a local government, the regional planning agency is to submit a report and recommendations which specifically address off-site matters. These include whether the "development will efficiently use or unduly burden public transportation facilities," Fla.Stat. § 380.-06(11)(a)(4), which to Beker seemingly includes highways. Debtor's Post Hearing Memorandum at 31–32. The relevance of transportation of phosphate ore to a mine's regional impact cannot be disputed. Indeed, Beker discussed its transportation

plans in its 1974 ADA and filed its 1983 ADA to clarify them.

Not at all detracting from the regulatory nature of Fla.Stat. ch. 380 is the Florida Transportation Code, Fla.Stat. chs. 334–35. That statute vests within the Florida Department of Transportation responsibility "for the coordination of the total highway and road system within the state, including the operation and maintenance of roads," *Department of Transportation v. Hanes*, 448 So.2d 1130, 1131 (Fla.Dist.Ct.App.1984). The statute charges the Department with responsibility for anticipating future needs within the total environment of the "community", *ibid*, vests it with jurisdiction over state roads, Fla.Stat. § 335.02(1), and authorizes it to prescribe regulations for vehicles on state roads. Fla.Stat. § 335.10. There is nothing on the face of the statute which precludes the local governmental unit where a development is to be located from examining, pursuant to Fla.Stat. § 380.06(11), the impact on local roads were an ADA to be approved. Nor is there anything that prohibits the Commission from also examining that issue in connection with an ADA.

The state statute is thus clearly regulatory. The Proceeding sought to be enjoined concerns the off-site impact of a mining operation and is thus concerned with the subject matter of that statute. Beker's principal claim, that it concerns the closing of the Wingate Creek mine, is simply not sustained by the record. If the Hearing Officer's report is approved, the effect on Beker is to increase its costs. The Commission Proceeding does not attempt to affect a distribution of Beker's assets or otherwise affect this Court's jur-

---

**10.** *See The Federalist* No. 46. While Beker's complaint contains such a challenge, as noted it is not now before us.

**11.** Nothing in *Midlantic* is to the contrary. There, the only issue before the Court was whether § 554(a) of the Bankruptcy Code authorizes a trustee to abandon property in contravention of state law or regulations that are reasonably designed to protect the public's health and safety. A footnote at the end of the opinion for the Court states that the "abandonment power is not to be fettered by laws or

regulations not reasonably calculated to protect the public health or safety from imminent and identifiable harm." 106 S.Ct. at 762, n. 9. That footnote can hardly be said to be a reconciliation of the cases under § 362(b)(4). Furthermore, Justice Powell, in writing for the Court, implied that § 362(b)(5), and hence the parallel exception provided by § 362(b)(4), is broader, observing that "*one* of the purposes of this exception is to protect public health and safety." At 761. (Emphasis added).

isdiction and control over the assets of these estates. Nor will the proceeding to amend Beker's 1974 ADA, to establish its ability to truck phosphate ore, effectively revoke or forfeit that ADA. As noted, Beker's trucking rights under its 1974 ADA, as opposed to its estoppel claims, are uncertain. Beker's assertion, made only at argument at the close of the hearing, that the County's motivation is to cause Beker to pay for revamping State Road 64, is meritless. A payment provision of $200,-000 had its genesis in the first settlement with the County. The Hearing Officer accepted the sum of $800,000 as Beker's mitigation of adverse impact to the road.

 The whole course of the various proceedings involving the County and Beker is relevant to the allegation of bad faith in the current Proceeding. But it is the nature of the current Proceeding itself which is determinative of whether its continuation by the Commission and County fits within the exemption. Section 362(b)(4) so states on its face. Concomittantly, it is the nature of the regulatory act itself which should determine whether the control provision of § 362(a)(3) applies. Zoning and land use planning are exemplary of police and regulatory powers. *E.g., Village of Belle Terre v. Boraas,* 416 U.S. 1, 9, 94 S.Ct. 1536, 1941, 39 L.Ed.2d 797 (1974); *Berman v. Parker,* 348 U.S. 26, 32, 75 S.Ct. 98, 102, 99 L.Ed. 27 (1954). Absent consideration of the constitutional issues not now before us, *see* n. 4 *supra,* the exemption applies and the stay provided by § 362(a)(3) does not.

### C.

Nor has Beker shown a probability of success in its assertion that it will be entitled to injunctive relief to protect assets of these estates. This claim concerns the prospective cost of attorneys fees that will be generated in the future and the highly speculative claim that it might be forced to close its Wingate Creek mine or build a railroad costing $15–20 million. (Debtors' Memorandum at 17–19).

 The traditional power of bankruptcy courts to enjoin threats to the property of estates is beyond cavil. *E.g., National Labor Relations Board v. Superior Forwarding, Inc.,* 762 F.2d at 698; *In re Vantage Petroleum Corp.,* 25 B.R. 471, 476, 9 B.C.D. 1248 (Bankr.E.D.N.Y.1982). But the reach of that discretionary power is not without defined limits. *National Labor Relations Board v. Jonas (In re Bel Air Chateau Hospital, Inc.),* 611 F.2d 1248 (9th Cir.1979).

Among those limits is that where it is claimed that a proceeding will threaten estate assets through incurring legal fees, the threat must be materially significant. As stated by the Eighth Circuit in *Superior Forwarding,* upon which Beker relies:

> the costs incurred in defending against charges may deplete the estate.... We are not holding that, as a matter of law, litigation expenses are a threat to the assets of a bankruptcy estate. To the contrary, there will probably be cases where going forward with regulatory proceedings will not threaten the assets of a bankrupt estate, even though it may diminish them.

762 F.2d at 699; *see also In the Matter of Nicholas, Inc.,* 55 B.R. 212, 13 B.C.D. 1022, 1025 (Bankr.D.N.J.1985).

 Here the future fees that may be incurred on appeal have not been identified. They may reach $100,000 or more. But that sum is hardly a threat to these estates scheduling assets in excess of $411 million and having a weekly budget in excess of $3 million. They are not material.

The additional averment that Beker may have to expend $15–20 million to build a railroad hardly changes this conclusion. Beker's officers testified that it has not been granted the eminent domain power needed to acquire the necessary rights of way. And as noted, the threat to Beker's mine is only through the exercise of regulation within, on this record, the contemplation of 28 U.S.C. § 959(b).[12]

---

**12.** For the reasons discussed at pp. 21–22, also

lacking in probability of success is Beker's as-

## VI

None of these issues, with the possible exception of the scope of the § 362(b)(4) exemption addressed above and the constitutional issues not now before us, moreover, are sufficiently serious to invoke the balance of hardships test. As to that issue, the presence of language in the *In re King Memorial Hospital* line of cases might make the scope of the stay subject to further litigation but the balance of hardships does not tip decidedly in Beker's favor. The presence of the existing circuit court injunction is more than sufficient to protect Beker at this stage regardless of the determination by the Commission on February 18, 1986.

We have considered the other points raised by the parties and find them without merit. The foregoing constitutes this Court's findings of facts and conclusions of law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure. The County's motion to dismiss for lack of subject matter jurisdiction or to abstain is denied. Beker's motion for a preliminary injunction must also, on this record,[13] be denied.

IT IS SO ORDERED.

sertion that it needs injunctive protection to enable its management to administer these estates for the duration of these Proceedings or for the period of exclusivity for a debtor to propose a plan of reorganization set forth in § 1121 of the Bankruptcy Code. In addition, Beker made no showing that, by the expiration of that period in mid-April 1986, it might be able to propose a plan were the relief requested here granted.

13. During the pendency of a large and complex Chapter 11 case, a bankruptcy court often knows of other information attendant to the bankruptcy, but not before the court on the record upon which it decides individual matters.