**In re PRUDENTIAL LINES, INC., Debtor.**

**The OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

**and**

**Cold Spring Shipping, L.P., Plaintiffs,**

v.

**PSS STEAMSHIP COMPANY, INC., Defendant.**

**Bankruptcy No. 86–B–11773. Adv. No. 89–6430A.**

United States Bankruptcy Court, S.D. New York.

Dec. 4, 1989.

See also, Bkrtcy., 79 B.R. 167.

White & Case, New York City by Allan L. Gropper, Barbie D. Lieber, and James Laughlin, for The Official Committee of Unsecured Creditors.

Wilmer, Cutler & Pickering, Washington, D.C. by Timothy Dyk, William J. Perlstein, Philip D. Anker, Bryan Slone, and Patrick T. Conners, for Cold Spring Shipping, L.P.

Battle Fowler, New York City by W. Bruce Johnson, Nancy J. Mrazek, and Richard L. O'Toole, for PSS Steamship Company, Inc.

**HOWARD C. BUSCHMAN, III,**
Bankruptcy Judge.

The instant motion for a preliminary injunction presents the legal issue of whether a debtor's potential ability to carry over pre-bankruptcy net operating losses is protected by the automatic stay from the claiming of a worthless stock deduction by its parent.

Plaintiffs, the Official Committee of Unsecured Creditors (the "Creditors' Committee") and Cold Spring Shipping, L.P. ("Cold Spring"), seek a preliminary injunction barring defendant PSS Steamship Company, Inc. ("PSS") from claiming a worthless stock deduction for its stock in Prudential Lines, Inc. ("Debtor" or "PLI") in an original or amended federal income tax return for the tax year 1988 or any tax year prior to that in which the confirmation of a plan of reorganization of the Debtor occurs. They assert that the claiming of such a deduction for preconfirmation tax years would, under the tax laws, destroy the Debtor's $74 million net operating loss ("NOL") carryovers.

I

An involuntary bankruptcy petition was filed on September 12, 1986 against PLI, a corporation organized under the laws of the State of Delaware, pursuant to § 303 of Title 11 of the United States Code (the "Code"). PLI subsequently consented to the entry of an order for relief and has since been operating its business as debtor-in-possession under §§ 1107 and 1108 of the Code.

Defendant PSS, a corporation organized under the laws of the State of Delaware, is a holding company owning all of the outstanding stock of PLI. Its tax basis in that stock is approximately $38,900,000. Tr. at 48; Pls' Exh. 4.[1]

The extended Skouras family controls PSS through a series of holding companies and trusts. Stip. at 7–8. Spyros S. Skouras, Sr. was chief executive officer and a

director of both PLI and PSS until he resigned in early November 1989 from his positions at PLI. Stip. at 12–13. His son, Spyros S. Skouras, Jr., remains an officer and a director of the Debtor. Tr. at 58.

PLI and PSS are two of four affiliated entities that have filed consolidated federal income tax returns since 1976. Stip. at 9. Of the total $75 million NOL presently available to the four entities, $74 million is attributable to PLI. Tr. at 139; Pls' Exh. 4.

During the course of this case, Plaintiff Cold Spring acquired a participation interest in the deficiency claim of the United States Maritime Administration, likely the Debtor's largest unsecured creditor. Together with the Creditors' Committee, appointed in January 1987 pursuant to § 1102 of the Code, Cold Spring filed a Second Amended Joint Plan of Reorganization dated October 2, 1989 (the "Joint Plan") with the court. A disclosure statement describing the Joint Plan (the "Disclosure Statement") was approved by this Court on October 3, 1989 as containing adequate information in accordance with § 1125 of the Code. Copies of the Joint Plan and accompanying Disclosure Statement were subsequently disseminated to PLI's creditors. A confirmation hearing with respect to the Joint Plan is currently scheduled for December 7, 1989.

Although Cold Spring and the Creditors' Committee will seek to confirm the Joint Plan even were PLI's NOL carryovers to be destroyed, Tr. at 177–8, the Joint Plan contemplates the carryover of PLI's $74 million NOL. It provides, in salient part, that unsecured creditors are to receive $10 million in notes due five years after issuance and bearing 12.5% interest. Payment of these notes is to be funded by cash contributions of Cold Spring, income from Vessel Charters, Inc., a wholly owned operating subsidiary of PLI, and utilization of an Operating Differential Subsidy Contract. It is envisioned by the plan propo-

---

1. References to "Tr." and "Exh." are to the transcript of the hearing held on November 21, 1989 and exhibits admitted at that hearing. "Stip." refers to the facts contained in Defendant's

Memorandum of Law ("Def's Mem.") at 7–13 to which the parties stipulated at the hearing. Tr. at 13–14.

nents that PLI's $74 million NOL will be available to enhance recovery to creditors by reducing tax liabilities on the cash flow of businesses to be acquired, enabling payment ahead of schedule of the notes with the excess cash flow. Tr. at 177–8. The Joint Plan also proposes cancellation of the stock held by PSS and ouster of Spyros S. Skouras, Jr. from management of PLI.

In an objection dated September 19, 1989 to approval of an earlier version of the Disclosure Statement, PLI asserted that the Debtor's NOL would be "effectively eliminated if PSS exercises its right to claim a worthless stock deduction with respect to its stock in the Debtor for 1988." Stip. at 11.[2] Shortly after approval of the Disclosure Statement, Cold Spring focussed on that assertion. By letter to PSS, dated October 6, 1989, Cold Spring demanded that PSS disavow the right to take the deduction as represented by PLI. Stip. at 12. Numerous letters between PLI, PSS and Cold Spring[3] culminated in PSS' advising Cold Spring, by letter dated November 6, 1989, that it reserved the right to take the deduction within ten days unless enjoined by a court of competent jurisdiction. *Id.*

## II

Consequently, on November 13, 1989, plaintiffs filed a complaint with this Court seeking a temporary restraining order and preliminary and permanent injunctions against PSS from claiming a worthless stock deduction with respect to its stock in

PLI in any tax year prior to the year in which confirmation of a plan of reorganization occurs.

Count one of the complaint asserts that PSS' claiming a deduction in any tax year other than in the year in which confirmation occurs would breach its fiduciary duty to the Debtor and its creditors. Count two asserts that threats by PSS to take the deduction for the 1988 tax year are an attempt made in bad faith by the Skouras family to defeat the Joint Plan and retain control of PLI in breach of its fiduciary duties to the Debtor and its creditors. In both counts, it is alleged that there is no legitimate tax benefit to be gained by PSS in taking the deduction in 1988 since PSS had no income in that year or in any year to which a loss could be carried back. Count three asserts that PLI's NOL carryovers are property of the estate under the Code and that any act by PSS that would extinguish them or secure their benefit to PSS rather than PLI constitutes a violation of the automatic stay pursuant to § 362(a)(3). Plaintiffs sought preliminary injunctive relief on all counts.

Upon the parties' summary showings regarding the need for immediate relief, this court, on November 13, 1989, issued the temporary restraining order sought against PSS, pursuant to Bankruptcy Rule 7065, pending hearing on the motion for a preliminary injunction.[4]

At the evidentiary hearing held on November 21, 1989 on the motion for a prelim-

---

2. Under § 382(a) of the Internal Revenue Code, 26 U.S.C. § 382 (1988), if there is a change in ownership of a loss corporation, the availability of that entity's NOL is limited to the value of the corporation times a prescribed rate of return. A deemed ownership change occurs pursuant to § 382(g)(4)(D) of the Internal Revenue Code on the last day of the tax year in which a majority shareholder declares its stock to be worthless by taking a loss deduction. PSS reports income on a calendar year basis. Thus, if PSS were to claim a worthless stock deduction for the 1988 tax year, a deemed ownership change would take place on December 31, 1988.

3. Requested by plaintiff Cold Spring to demand of PSS that it not claim the deduction for the 1988 tax year, the Debtor declined, claiming it owed fiduciary duties to all parties in interest. Stip. at 12.

4. Bankruptcy Rule 7065 makes Rule 65 of the Federal Rules of Civil Procedure applicable to adversary proceedings. Under Rule 65(b), a temporary restraining order may be granted "upon a summary showing of its necessity in order to prevent immediate and irreparable injury." Fed.R.Civ.P. 65(b). On a motion for preliminary injunction, the movant must establish "irreparable harm and either (1) probable success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation plus a balance of hardships tipping decidedly in plaintiff's favor." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979). Where an act would violate the automatic stay, irreparable harm is established by the violation since Congress, by legislatively staying such acts, has determined that they cause irreparable injury to the estate. *Beker Ind. Corp. v. Florida Land and*

inary injunction, however, this Court denied relief under the first count of the complaint, concluding that under applicable law, plaintiffs did not show a probability of success on the merits or serious questions going to the merits.[5] We similarly concluded that the Plaintiffs failed to demonstrate a probability of success of the second count, the gravamen of which is that Skouras Jr. threatened that PSS would take the deduction in order to distort the creditor process. No evidence supporting that claim was adduced. Moreover, since it was shown that PSS' return claiming the declaration was to be filed immediately upon the lifting of any legal restraints and the claiming of the deduction would adversely impact Skouras Jr.'s hopes to reorganize PLI, the evidence rebuffed the theory alleged.[6]

The court reserved decision on whether termination of a debtor's NOL is barred by § 362(a)(3) of the Code.[7] That question presents two issues: (i) is the right to carry forward an NOL "property" of an estate as envisioned by that section and (ii) if so, is the taking of a worthless stock deduction by a sole shareholder an exercise of control as also envisioned. These are issues of first impression. Although we initially treated with considerable skepticism plaintiffs' claim that the automatic stay bars taking a worthless stock deduction by a parent of a debtor-in-possession, analysis of the statute, legislative history and policy considerations require that result.

### III

#### A.

■ Because the terms of art of an integrated statute are generally to be inter-

*Water Adjudicatory Commission (In re Beker Ind. Corp.),* 57 B.R. 611, 621 (Bankr.S.D.N.Y. 1986).

5. Skouras, Sr. credibly testified that PSS sought to take the deduction for the 1988 tax year on advice of Battle Fowler and BDO Seidman, its attorneys and its accountants, respectively, Tr. at 30-6, 44; that PSS was being pressured by and was obligated to its minority shareholders, dissident members of the Skouras family, to take the deduction in that year, Tr. at 53-4; that PSS' federal income tax return for 1988 was prepared and would be filed immediately upon the lifting of any legal bar, Tr. at 44; that PSS sought the deduction to build its own NOL by which it could offset any deemed income expected as a result of cancellation of indebtedness by Chase Manhattan Bank, N.A., Tr. at 47-8, 54-6. It thus became apparent during the hearing that PSS planned to take the deduction for its own purposes and not merely to advance the efforts of Spyros S. Skouras Jr. to defeat the Joint Plan. If PSS' taking the deduction would eliminate the Debtor's ability to carry forward its $74 million NOL, such act would preclude enhancement of any plan of reorganization, not only that of the plaintiffs, but also that which Skouras Jr. hopes to advance if the Joint Plan is defeated. Tr. at 162-4. Applying Delaware corporate law, this court held that the state law issue is to be judged by fairness and the business judgment rule. *Meyerson v. El Paso Natural Gas Co.,* 246 A.2d 789 (Del Ch. 1967); *see also, Western Pacific R.R. Corp. v. Western Pacific R.R. Co.,* 197 F.2d 994, *reh'g denied,* 197 F.2d 1012 (9th Cir.1951), *vacated and remanded on other grounds,* 345 U.S. 247, 73 S.Ct. 656, 97 L.Ed. 986 (1953), *prior opinion aff'd,* 206 F.2d 495 (9th Cir.1953), *cert. denied,* 346 U.S. 910, 74

S.Ct. 242, 98 L.Ed 407, *reh'g denied,* 346 U.S. 940, 74 S.Ct. 376, 98 L.Ed. 428 (1954); *Case v. New York Central R.R. Co.,* 232 N.Y.S.2d 702 (1962), *rev'd,* 19 A.D.2d 383, 243 N.Y.S.2d 620 (1963), *rev'd,* 15 N.Y.2d 150, 256 N.Y.S.2d 607, 204 N.E.2d 643 (1965). Here, PSS had a valid business reason for taking the deduction and there was no gross overreaching by PSS. Thus the court did not pass upon the business judgment of PSS' management. *See, Meyerson,* 246 A.2d at 794; *see also, Western Pacific,* 197 F.2d 994; *Case,* 15 N.Y.2d 150, 256 N.Y.S.2d 607, 204 N.E.2d 643. This court also held that while Delaware law prohibits a director from using the subject corporation to further its own interests and requires it to protect the interests of the corporation, it does not require a shareholder to forego tax benefits to which it is entitled under the Internal Revenue Code merely because it is the sole shareholder of the corporation. *Meyerson,* 246 A.2d at 791-2; *see also, Western Pacific,* 197 F.2d at 1004.

6. Although PSS in its brief argued that it was far from clear whether the Debtor's ability to carry over its NOLs would be eliminated as a result of the deduction in 1988, the hearing proceeded on the basis that PLI's NOL carryovers would be terminated. Tr. at 96, 210. Accordingly, irreparable harm was found in that termination of the NOLs would constitute a deprivation of a tax attribute or property not be compensable in damages. Tr. at 210-11.

7. Section 362(a)(3) provides that the filing of a bankruptcy petition automatically stays "any act *to obtain possession of property of the estate or* of property from the estate or to exercise control over property of the estate."

preted consistently,[8] the definition of property under § 362(a)(3) is governed by § 541 where Congress sought to define the scope of a bankruptcy estate's property. In § 541(a)(1) it is provided that "such estate is comprised of all of the following property wherever located and by whomever held:

(1) ... all legal or equitable interests in property as of the commencement of the case." § 541(a)(1).

That the term "property" is broader than tangible physical property, claims to property, and causes of action is made clear by § 541(b)(1). In that section, Congress excluded from the term "property" "any power that the debtor may only exercise solely for the benefit of an entity other than the debtor...." § 541(b)(1). Powers that a debtor may exercise for its own benefit are, therefore, included or there would be no need for the exemption. Since the provisions of § 541 in their entirety are to be viewed "as definition of what is included in an estate rather than a limitation," *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 203, 103 S.Ct. 2309, 2312, 76 L.Ed.2d 515 (1983), it follows from the language of the statute that other non-leviable or even non-transferable rights of a debtor come within the broad embrace of § 541(a)(1) and its definition of the composition of a bankruptcy estate, notwithstanding that the right may not fall within more traditional or common law concepts of property.[9] The statutory language thus implies that a tax attribute, such as the potential ability of a

debtor-in-possession and reorganized debtor to use loss carryovers to offset future taxable income, falls within the ken of property under § 541(a)(1).

Such a result, moreover, flows from § 346(h). That section expressly contemplates that NOLs belong to the bankruptcy estate. It provides:

Notwithstanding section 728(a) and 1146(a) of this title, for the purpose of determining the number of taxable periods during which the debtor or the *estate may use a loss carryover or a loss carryback*, the taxable period of the debtor during which the case is commenced is deemed not to have been terminated by such commencement.

§ 346(h) (emphasis added). Since there is no provision that expressly provides for the inclusion of NOLs in an estate of a corporate debtor,[10] it appears that Congress must have contemplated that NOLs came into a bankruptcy estate through the provisions of § 541(a)(1).

### B.

While it might be argued that § 346(h) applies for tax purposes only,[11] careful examination of the legislative history confirms that estate property includes a debtor-in-possession's right to carry forward an NOL.

The identical reports of both houses of Congress observed with respect to § 541(a)(1):

It was apparently enacted to address the Supreme Court's concern, expressed in *Segal v. Rochelle*, 382 U.S. 375, 86 S.Ct. 511, 15 L.Ed.2d 428 (1966), for the fresh start individuals obtain upon discharge. See discussion *infra*. That the failure to expressly provide that estate property includes the right of corporate debtors to use NOLs is of no significant consequence since Congress made reference to individuals in the context of addressing that concern.

---

**8.** *See,* F. Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum.L.Rev. 528, 537–8 (1947).

**9.** The limitations of former § 70(a)(5)'s definition of property to alienable or leviable property in the debtor's possession were discarded by Congress in enacting § 541 of the Bankruptcy Code. Congress intended to include within the § 541(a) definition of property "all interests, ... contingent interests and future interests, whether or not transferable by the debtor." H.R.Rep. No. 595, 95th Cong. 1st Sess. 175–76 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6136.

**10.** Section 346(i) provides that loss carry forwards belong to the bankruptcy estates of individuals to the extent utilized by the trustee and revert to the debtor on closing of the case. *See also,* § 1398(g) of the Internal Revenue Code.

**11.** *But see, Holder v. Wilson (In re Wilson)*, 49 B.R. 19, 20–21 (Bankr.N.D.Tex.1985), wherein the Court held that § 346(i) codified the holding in *Segal* and required that NOL carrybacks attributable to an individual debtor and giving rise to a tax refund be included within the definition of estate property.

the estate is comprised of all legal or equitable interest of the debtor in property, wherever located, as of the commencement of the case. The scope of this paragraph is broad. It includes all kinds of property, including tangible or intangible property, cause of action (see Bankruptcy Act § 70a(6)), and all other forms of property currently specified in section 70a of the Bankruptcy Act § 70a. *The result of Segal v. Rochelle*, 382 U.S. 375 [86 S.Ct. 511, 15 L.Ed.2d 428] (1966), *is followed,*

*and the right to a refund is property of the estate.* H.R.Rep. No. 95–595, 95th Cong. 1st Sess. 367 (1977); S.Rep. No. 95–989, 95th Cong.2d Sess. 82 (1978) (emphasis added), U.S.Code Cong. & Admin.News 1978, pp. 5868, 6323.

*Segal v. Rochelle*, 382 U.S. 375, 86 S.Ct. 511, 15 L.Ed.2d 428 (1966), involved the closely analogous issue of whether a NOL carryback is property of a bankruptcy estate. The debtors, two partners and their partnership, commenced their bankruptcy cases by filing bankruptcy petitions at the end of the third quarter of 1961. After the close of that calendar year, the partners filed for tax refunds for the two years prior to the year of the bankruptcy by applying and carrying back losses incurred by the partnership in 1961 prior to the filing of the bankruptcy petitions. The Court held that the potential claims for loss carryback refunds due to pre-bankruptcy losses are property of the estate.

In so holding, the Court ruled that bankruptcy purposes controlled the definition of property under § 70(a)(5) of the Bankruptcy Act, 11 U.S.C. § 110(a)(5) (1970) (repealed), the predecessor to § 541(a)(1), rather the meanings attributed to "property" in other contexts. It added:

The main thrust of § 70a(5) is to secure for creditors everything of value the bankrupt may possess in alienable or leviable form [12] when he files his petition. To this end the term "property" has been construed most generously and an interest is not outside its reach because it is novel or contingent or because enjoy-

ment must be postponed ... Turning to the loss-carryback refund claim in this case, we believe it is sufficiently rooted in the pre-bankruptcy past and so little entangled with the bankrupts' ability to make an unencumbered fresh start that it should be regarded as "property" under § 70a(5).

382 U.S. at 379–80, 86 S.Ct. at 515.

Thus, at commencement of the bankruptcy case, the debtors in *Segal* had, like the debtor here, pre-bankruptcy net operating losses that might, depending on compliance with the Internal Revenue Code, be applied advantageously. By expressly referring to *Segal*, the legislative history consequently demonstrates a congressional intent that NOLs be included in estate property under the Code.

## C.

The *Segal* Court characterized NOLs as a potential claim for refunds due to the carryback provisions of the Internal Revenue Code. Here, the movants desire to preserve those losses to apply in the future if a plan reorganizing the debtor is confirmed and if the reorganized debtor has income. Does the difference lead to a differentiation in result?

In *Segal*, the debtors argued that, since the trustee's claim to the refunds depended on the notion that an NOL is estate property, to hold that the refunds belonged to the estate was also to hold that loss carryovers likewise belonged to the estate. *Segal*, 382 U.S. at 381, 86 S.Ct. at 515. They argued that to so hold would force bankrupt estates to be kept open for long periods. In cases involving individuals, this assertion appeared to disturb the Court, seemingly because an individual's fresh start might be unduly penalized due to the inability to use NOL carryovers not likely to be utilized by a trustee in liquidating an estate:

While in fact the trustee can obviate this detriment to the estate—by selling a contingent claim in some instances or simply forgoing it—inconvenience and hindrance might be caused for the bankruptcy indi-

12. *See, n. 9, supra.*

vidual. Without ruling in any way on a question not before us, it is enough to say that a carryover into post-bankruptcy years can be distinguished conceptually as well as practically. The bankrupts in this case had both prior net income and a net loss when their petitions were filed and apparently would have deserved an immediate refund had their tax year terminated on that date; by contrast, the supposed loss-carryover would still need to be matched in some future year by earnings, earnings that might never eventuate at all.

*Id.* .

Section 346(i) of the Bankruptcy Code addresses this concern. It provides that an individual's bankruptcy estate succeeds to loss carryovers; that they are returned to the debtor when the case is closed or dismissed to the extent not utilized; and that the debtor may utilize any NOLs as though the applicable periods for the use of loss carryovers were suspended in the interim.

The conceptual and the practical distinctions noted by the Court simply disappear in the case of a reorganized company. Plans involving companies such as White Motor Corp., Allis–Chalmers Corp. and McLean Industries, Inc., all having significant NOLs, have been confirmed long before the expiration of loss carryover periods. Final decrees are issued in Chapter 11 cases when a plan of reorganization is substantially consummated. *See* § 1101; Bankruptcy Rules 2015(a)(6), (7), 3022. If a debtor corporation is liquidated either under Chapter 7 or pursuant to a Chapter 11 plan, no discharge is granted, §§ 727(a)(1), 1141(d)(3), and there is no concern for a fresh start. Unless the corporation is reorganized, NOL carryovers will apparently be lost. Nor does the indefiniteness or the contingency of a loss carryover make a loss carryover any less estate property. Con-

tingent and future interests of a debtor are estate property. *See* n. 9 *supra.*[13] Thus, in the case of a corporate debtor, there appears no cognizable reason to differentiate loss carryovers from carrybacks.

### D.

Strong policy reasons, moreover, support the conclusion that debtor's potential ability to utilize NOLs is property of an estate. While the definition of property of an estate does not depend on the property having any value, it cannot be gainsaid that "the right to use the loss as an offset ... is valuable ... The market for it is restricted, of course, but this detracts nothing from its value to one in a position to utilize it." *Western Pacific R.R. Corp. v. Western Pacific R.R. Co.*, 345 U.S. 247, 276, 73 S.Ct. 656, 670, 97 L.Ed. 986 (1953) (Jackson, J. dissenting). It is only just and appropriate that creditors be given the opportunity to attempt to realize on that value. They have not been paid because of the very losses giving rise to the NOLs. Their short-fall should not be increased further through failure to recognize loss carryforward rights as part of a bankruptcy estate.[14]

To this, defendant responds that the Internal Revenue Code does not treat NOLs as property in, for example, allocation of purchase price among assets acquired in the acquisition of a trade or business, *see,* I.R.C. § 1060; Temp.Treas.Reg. 1.338(b)–2T; that NOLs are more like a tax exemption held not to be property in *In re Heritage Village Church–Missionary Fellowship*, 87 B.R. 401, 405 (D.S.C.1988); that they are created by statute and taken away by statute; and that recognizing NOLs as property could yield "untoward results," consisting principally of the threat of applicability of fraudulent transfer law and al-

---

**13.** The language of § 541, moreover, so confirms. Section 541(a)(5) limits contingent future interests only in instances involving bequests, inheritance, matrimonial settlements and life insurance policies to the actual property so received by a debtor within 180 days of the filing of the bankruptcy petition. Other contingent future interests in property are not so limited.

**14.** Indeed, Skouras Jr. testified at the hearing that he believed that PLI's $74 million NOL was "an important potential asset of the estate," Tr. at 62; that he "hoped" it would be a "valuable asset of the estate," *id.;* and that "among the assets the Debtor possessed was a net operating loss," Tr. at 88.

leged difficulty in allocation of NOLs among affiliates in bankruptcy. Def's Mem. at 14–20.

In *Segal,* however, the Court held that property of an estate is to be defined by bankruptcy purposes, not by the Fifth Amendment's Just–Compensation clause or a state taxing statute. *Segal,* 382 U.S. at 379, 86 S.Ct. at 514. The same reasoning applies to attempts to define estate property by the Internal Revenue Code: the purposes differ. To be sure, ability to use an NOL depends on compliance with the tax laws, just as a debtor's ability to utilize a mine depends on compliance with applicable state and local regulation. *See, Beker Ind. Corp. v. Florida Land and Water Adjudicatory Commission (In re Beker Ind. Corp.),* 57 B.R. 611, 622–24 (Bankr.S.D. N.Y.1986). But that dependence does not mean the absence of a property right. *Id.* To the extent that *Heritage Village,* a case where the IRS sought to revoke a debtor's tax exempt status implies anything more than that such a revocation is exempt from the automatic stay by virtue of § 362(b)(4),

*see,* 87 B.R. at 404, it is not followed here.[15] In *Beker* it was held that similar good faith governmental revocation of a permit is not within the bar of § 362(a)(3).[16]

Of more significance is the assertion that recognition of NOL's as estate property will induce instability in pre-bankruptcy tax returns of affiliated companies through the application of fraudulent transfer statutes such as § 548 of the Bankruptcy Code where tax savings have been achieved through the filing of a consolidated return or where a worthless stock deduction has been taken by a parent. To this is added the notion that a corporation generally has no interest in transactions in its stock.

Like the *Segal* Court, we do not decide these issues and we note that the consequences alleged are largely hypothetical and not necessarily unjust. If the fraudulent transfer section of the Code, § 548, were to apply, it would be through an intended detriment to creditors or the failure of a debtor to receive reasonably equivalent consideration while insolvent.[17] It is

**15.** Moreover, the *Heritage Village* Court stated that § 362(a)(3) bars assessment of taxes by the Internal Revenue Service, 87 B.R. at 405, thereby failing to recognize that § 362(b)(9), added in 1986, exempts the issuance of a notice of tax deficiency by a governmental unit from the automatic stay. In *Bob Jones University v. Simon,* 416 U.S. 725, 94 S.Ct. 2038, 40 L.Ed.2d 496 (1974), the Supreme Court held that the Anti Injunction Act, 26 U.S.C. § 7421, prohibits enjoining the revocation of tax exempt status on the ground that, although the Anti Injunction Act barred only law suits brought for the purpose of restraining assessment and collection of taxes, revocation of the exemption was a prelude to assessment. 416 U.S. at 731–33, 94 S.Ct. at 2043–44. Since revocation is a prelude to a notice of deficiency, it would fall within the exemption provided by § 362(b)(9). Thus, the *Heritage Village* court's ruling that a tax exemption is not property within § 362(a)(3) was unnecessary to its holding that revocation is not barred by the automatic stay.

**16.** In asserting that NOLs are not property of the estate, defendant relies on *Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.),* 700 F.2d 935 (5th Cir.1983) and *D.H. Overmyer Telecasting Co. v. Lake Erie Communications, Inc. (In re D.H. Overmyer Telecasting Co.),* 35 B.R. 400 (Bankr. v. N.D. Ohio 1983). *Braniff* held that Federal Aviation Administration rules limiting air carrier operation to landing slots do not create property rights.

700 F.2d at 942. The *Overmyer* Court held that a license issued by the Federal Communications Commission is not property. 35 B.R. at 401–03. Both cases failed to recognize that, in enacting § 541, Congress intended inclusion of interests, whether or not transferable, in its expansion of property of the estate. *Overmyer,* moreover, was decided prior to the Supreme Court's ruling in *Whiting Pools* that estate property is to be broadly defined and *Braniff,* although decided after the Supreme Court's decision, failed to cite it. Accordingly, this Court, following *Bernstein v. R.C. Williams, Inc. (In re Rocky Mtn. Trucking Co.),* 47 B.R. 1020 (D.Colo.1985) (holding that a license is estate property) and applying *Whiting Pools,* so distinguished those cases and held in *Beker Ind. v. Florida Land and Water Adjudicatory Commission (In re Beker Ind. Corp.),* 57 B.R. 611 (Bankr.S.D.N.Y.1986), that a debtor-in-possession's right to truck its products from its mine, although subject to state and local regulation, lies within the purview of property of the estate. 57 B.R. at 622. The *Heritage Village* Court also failed to consider *Whiting Pools.*

**17.** Section 548(a)(1) of the Code, § 7 of the Uniform Fraudulent Conveyance Act ("UFCA"), and § 4(a)(1) of the Uniform Fraudulent Transfer Act ("UFTA") invalidate transfers made with actual intent to hinder, delay or defraud present or future creditors of the transferor. Those statutes also void transfers amounting to con-

hardly contrary to bankruptcy purposes to avoid transactions so motivated or to require a solvent affiliate having positive income to return to an insolvent debtor its share of tax savings achieved through the filing of a consolidated return utilizing losses generated by the debtor during the one year pre-bankruptcy period permitted by § 548 of the Code if the debtor failed to receive reasonably equivalent value. In *Western Dealer Mgmt., Inc. v. England (In re Bob Richards Chrysler–Plymouth Corp.),* 473 F.2d 262 (9th Cir.1973), *cert. denied,* 412 U.S. 919, 93 S.Ct. 2735, 37 L.Ed.2d 145 (1973), the court held that a parent of a debtor who received a tax refund through filing a post-bankruptcy consolidated tax return including the debtor held the entire refund in trust for the bankruptcy estate since it was due to the carryback of prebankruptcy NOLs of the debtor. No cognizable reason appears why the result should be any different if a consolidated return were filed pre-bankruptcy and an insolvent debtor failed to receive reasonably equivalent consideration from the affiliate. Although the allocation of such savings is normally governed by the business judgment rule, *Meyerson v. El Paso Natural Gas Co.,* 246 A.2d 789 (Del.Ch. 1967); *see also, Western Pacific R.R. Corp. v. Western Pacific R.R. Co.,* 197 F.2d 994, *reh'g denied,* 197 F.2d 1012 (9th Cir.1951), *vacated and remanded on other grounds,* 345 U.S. 247, 73 S.Ct. 656, 97 L.Ed. 986 (1953), *prior opinion aff'd,* 206 F.2d 495 (9th Cir.1953), *cert. denied,* 346 U.S. 910, 74 S.Ct. 242, 98 L.Ed. 407 (1953), *reh'g denied,* 346 U.S. 940, 74 S.Ct. 376, 98 L.Ed. 428 (1954); *Case v. New York Central R.R. Co.,* 232 N.Y.S.2d 702 (1962), *rev'd,* 19 A.D.2d 383, 243 N.Y.S.2d 620 (1963), *rev'd,* 15 N.Y.2d 150, 256 N.Y.S.2d 607, 204 N.E.2d 643 (1965), the business judgment rule does not apply in fraud cases. *Meyerson,* 246 A.2d at 794; *see also, Western Pacific,* 197 F.2d at 994; *Case,* 15 N.Y.2d 150, 256 N.Y.S.2d 607, 204 N.E.2d 643. Indeed, one would think that in most cases the concern will not arise in view of the support that most parents afford subsidiaries and thus the presence of reasonably equivalent consideration.

Similar considerations would seem to apply to cases where a parent takes a worthless stock deduction pre-petition thereby limiting or eliminating prior NOL carryforwards of its prospectively bankrupt subsidiary. Reasonably equivalent consideration might be found. In any event, one would think the carryover consequences of terminating or limiting a prospective bankrupt's NOLs pre-bankruptcy are largely hypothetical. A worthless stock deduction can be taken only if the stock is truly worthless, including consideration of the possibility of reorganization in bankruptcy. Rev.Ruling 77–17, 1977–1 C.B. 44. If the situation is so bleak that only liquidation is in the offing, then NOL carryovers would generally be worthless to a corporate debtor since there will be no future income to offset. Thus, nothing of value would have been appropriated by the claiming of the deduction. If there is a prospect of reorganization, either as a going concern or through creation of an investment vehicle, the deduction will likely be unavailable pre-bankruptcy given that few, if any, Chapter 11 debtors seeking to reorganize as a going concern will concede initially that shareholders are not likely to be participants in the reorganized company, as is required to sustain the deduction. *See, Id.*

Nor does the task of separating NOLs among bankrupt affiliates raise the daunting spectre forecast by defendant. There appears no reason why skilled accountants cannot perform these tasks, regardless of whether the companies are in bankruptcy.

---

structive fraud, *i.e.,* made by a transferor who is or is thereby rendered insolvent if it failed to receive "reasonably equivalent value" under § 548(a)(2) of the Code and UFTA § 5(a) or "fair consideration" under UFCA § 4. *See,* Murdoch, Sartin and Zadek, Leveraged Buyouts and Fraudulent Transfers: Life After Gleneagles, 43 The Business Lawyer 1, 9–11, 13 (1987). Since our task is to define property of a bankruptcy estate in light of bankruptcy purposes as *Segal* commands, we consider only transfers that are fraudulent under § 548 of the Bankruptcy Code. While a trustee may bring a fraudulent transfer suit under state law, that cause of action is measured by state law. The definition of property under those statutes may be governed by purposes other than federal bankruptcy purposes.

*See*, R.A. Jacobs, Post–TAMRA Chapter 11 Corporate Tax Survival Kit, U.S.C.L. Center Forty–First Tax Inst. ¶ 705 (Matthew Bender 1989) for a discussion of such an allocation. Indeed, in this very case, the parties have been able to determine that $74 million of the $75 million NOLs reflected on the consolidated tax return of four affiliated companies belong to PLI.

It thus remains that there are compelling bankruptcy purposes for including NOL carryforwards within the ken of estate property. The losses relate to the period when creditors were not paid and any value to be obtained should belong to them. The statutory language, legislative history and better reasoned case law permit no other conclusion. We, therefore, turn to the issue of whether the taking of a worthless stock deduction is an exercise of control over a debtor's NOLs.

## IV

■ Section 362(a)(3) stays "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." This matter was tried by both sides on the theory that by taking a worthless stock deduction, PSS will eliminate PLI's ability to carry forward its NOLs. *See*, Tr. at 96, 210.[18]

The contours of the open-ended phrase "exercise control" have been only partially described by case-law. In *Beker* this Court held that it did not apply to good faith governmental regulation of the use of es-

18. While PSS, in its brief, argues that that result is not certain, it gives no cogent reason for the alleged lack of certainty.

Under § 382 of the Internal Revenue Code, the utilization of NOL carryovers is limited if there is an ownership change defined by that section. The claiming of worthless stock deduction by a more than 49% shareholder will cause an ownership change if the owner retains its stock at the end of the tax year in which the deduction is claimed. § 382(g)(4)(D); Jacobs, ¶ 702.1. Because the value of the corporation prior to the ownership change is limited generally to the value of its stock immediately prior to an ownership change, § 382(e)(1), and a worthless stock deduction can only be taken if the stock is worthless, the claiming of the deduction by a 100% shareholder such as PSS will apparently render all NOL carryovers of the subject corporation valueless. Section 382(a) imposes the so-called "§ 382 limitation" for carryovers limiting them to the value of the corporation prior to the ownership change multiplied by the long term tax exempt rate. Thus, it appears that since the value of the stock will be zero if a worthless stock deduction is claimed by a 100% shareholder, the "§ 382 limitation" will be zero.

If the subject corporation is in bankruptcy, § 382(*l*)(5) states that the "§ 382 limitation" does not apply if the old loss corporation is the subject of a bankruptcy case or similar court proceeding immediately prior to the ownership change and if the shareholders and "old and cold" creditors of the corporation own at least 50% of the stock after the ownership change. Jacobs, ¶ 702.3. This provision would appear to contemplate an ownership change as a result of a plan of reorganization, foreclosure or receivership, not a worthless stock deduction. *C.f.* Jacobs, ¶ 701.2. If so, the "§ 382 limitation" would apparently apply to an ownership change caused by the claiming of a worthless stock deduction by a 100% shareholder before the effective date of a plan of reorganization and NOL carryovers would be lost.

If a worthless stock deduction is claimed by a 100% shareholder for a taxable year in which a confirmed plan of reorganization became effective or within a two year period thereafter, there is a possibility that NOL carryforwards will be lost. Section 382(*l*)(5)(D) reimposes the "§ 382 limitation" if another ownership change occurs within two years after an ownership change pursuant to a bankruptcy plan of reorganization and further provides that the "§ 382 limitation" is deemed to be zero for any taxable year after the second ownership change. Thus, the claiming of a worthless stock deduction by a 100% shareholder within two years after the effective date of a plan could eliminate NOL carryovers for subsequent years.

If the reorganization plan, however, provides for cancellation of the stock held by the 100% shareholder, it appears that claiming a worthless stock deduction post-effective date would not affect NOL carryovers. In providing for an ownership change upon the claiming of a worthless stock deduction, § 382(g)(4)(D) conditions the ownership change upon the stock being held at the close of the taxable year in which the deduction was claimed. This provision was added to overrule *Textron v. United States*, 561 F.2d 1023 (1st Cir.1977) and prevent a double deduction if the parent retains its stock. That condition will not be met if the stock is cancelled and consequently no ownership change should occur by virtue of claiming the deduction after cancellation. Thus, NOL carryforwards should be preserved to the extent permitted by other parts of § 382, *see e.g.*, § 382(*l*)(5)(C) and Jacobs, ¶ 702.3 regarding reduction in carryovers on exchange of debt for stock.

tate property, ruling that it was highly unlikely that Congress, in adding that phrase in P.L. 98–353 (1984), intended to overrule legislatively the government regulation exemption from the automatic stay set forth in § 362(b)(4). *Beker*, 57 B.R. at 626. In *Pension Benefit Guaranty Corp. v. the LTV Corporation (In re Chateaugay Corp.)*, 87 B.R. 779 (S.D.N.Y.1988), *aff'd*, 875 F.2d 1008 (2d Cir.), *cert. granted on another issue*, —— U.S. ——, 110 S.Ct. 321, 107 L.Ed.2d 311 (1989), the court ruled that the P.B.G.C.'s restoration of a debtor's terminated pension plans did not violate § 362(a)(3): the restoration was not an exercise of control over estate property although it reinstated obligations of the debtor to provide pension benefits to employees. 87 B.R. 805–06. In *Continental Air Lines, Inc. v. Hillblom*, 61 B.R. 758 (S.D.Tex.1986), the court held that § 362(a)(3) did not bar litigation against debtor arising from debtor's post-petition attempt to take over another corporation because the litigation sought to vindicate rights of the target corporation rather than to obtain a favorable position *vis a vis* the debtor's creditors, 61 B.R. at 776–79.

As stated in *Beker*, 57 B.R. at 626 and *Hillblom*, 61 B.R. at 776, 779, the control provision of § 362(a)(3) is to be defined by the underlying congressional purposes of preventing dismemberment of the estate and assuring orderly distribution.

The claiming of a worthless stock deduction having the effect of terminating potential use of loss carryovers violates the first of those purposes. It dismembers the estate by eliminating a potential that may be of benefit to creditors. That the effect is due to the legal consequences of the act is of no importance. *In re 48th Street Steakhouse, Inc.*, 61 B.R. 182 (Bankr.S.D.N.Y. 1986), *aff'd*, 77 B.R. 409 (S.D.N.Y.1987), *aff'd*, 835 F.2d 427 (2d Cir.1987), *cert. denied, Rockefeller Group Inc. v. 48th Street Steakhouse, Inc.*, 485 U.S. 1035, 108 S.Ct. 1596, 99 L.Ed.2d 910 (1988). There the court held that § 362(a)(3) barred a landlord from terminating the lease of its tenant where the effect under state law would be to terminate a sub-lease held by the debtor-in-possession.

Nevertheless, PSS, citing to legislative history pertaining to § 362(a)(1), argues that the sole purpose of the automatic stay is to afford a breathing spell and creditor protection by barring creditors from unilateral acts to the detriment of other creditors; that PLI's NOLs are subject to PSS' determination of when to take a worthless stock deduction; and that PLI, pre-petition, had no ability to affect that determination. To PSS, barring it from taking the deduction affords PLI an unintended windfall. These contentions are without merit.

■ It cannot be gainsaid that § 362(a)(1) is designed to afford a breathing spell and creditor protection by staying proceedings brought on pre-petition claims. Section 362(a)(3), however, is designed to afford additional protection permitting the bankruptcy process to work by enabling a debtor to keep estate property intact during the process at least until it becomes apparent that a feasible reorganization cannot be achieved in a reasonable period of time. *C.f. United Sav. Ass'n of Texas v. Timbers of Inwood Forest Associates, Inc.*, 484 U.S. 365, 376, 108 S.Ct. 626, 632, 98 L.Ed.2d 740, 751 (1988).

That PLI's NOL carryovers are subject to PSS' ability to take a worthless stock deduction is irrelevant. It is elementary, for example, that estate property subject to a lien is protected by § 362(a) from foreclosure even though a debtor had no defense to foreclosure prior to bankruptcy. The bar is not a windfall; it preserves estate property.

Accordingly, we hold that to claim the deduction would constitute a violation of the stay contained in § 362(a)(3) and should be enjoined. The foregoing constitutes this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

Settle Order.