## In re CUMBERLAND FARMS, INC., Debtor.

**Bankruptcy No. 92–41305–JFQ.**

United States Bankruptcy Court, D. Massachusetts.

Dec. 15, 1993.

---

Gayle P. Ehrlich, Sullivan & Worcester, Boston, MA, for Cumberland Farms, Inc.

Kathleen Dwyer, Ardiff & Morse, P.C., Danvers, MA, for Cent. Nat. Bank, Canajoharie.

Stuart Hertzberg, Pepper, Hamilton & Scheetz, Detroit, MI, for Official Unsecured Creditors Committee.

## OPINION

JAMES F. QUEENAN, Jr., Chief Judge.

On December 7, 1992, Central National Bank, Canajoharie (the "Bank") recovered judgment of $2,471,097.53 against George Haseotes ("Haseotes") in New York state court. Haseotes owns 25% of the issued and outstanding shares of Class A (voting) and Class B (nonvoting) common stock of the debtor, Cumberland Farms, Inc. (the "Debtor"). The Bank thereafter sued Haseotes in Massachusetts state court seeking to reach and apply his shares in payment of the judgment. It is seeking an order from the Massachusetts court requiring a public auction of the Haseotes stock and application of the sales proceeds in payment of the judgment. The Massachusetts court has issued a temporary restraining order enjoining Haseotes from transferring or encumbering his stock pending a final hearing.

Presently before this court is the Bank's motion requesting an order declaring the reach and apply action in state court not to be in violation of the automatic stay or, in the alternative, granting relief from stay. The Debtor objects to the motion on the ground the relief sought in state court would deprive it of the substantial benefits described below. These benefits, it says, are property of the estate and protected by the automatic stay.

The Debtor is a "Subchapter S" corporation whose income and losses are passed through to its stockholders.[1] The pass-through of income has tax advantages to the extent that, were the Debtor a "Subchapter C" corporation, (i) the tax rates of the Debtor's stockholders are less than what the Debtor's rate would be, and (ii) income generated by the Debtor would have otherwise been paid out in dividends and thus taxed at both the corporate and stockholder levels. The pass-through of losses presents perhaps even greater tax advantages. It permits the Debtor's shareholders to offset losses generated by the Debtor against their own individual incomes.[2] The total amount offset, however, may not exceed the shareholder's tax basis for his stock, usually his cost.[3]

The Debtor has suffered substantial losses in recent years. Its losses have exceeded the tax basis of the stock held by Haseotes and the other stockholders by about $66 million,

---

**1.** See 26 U.S.C. § 1366 (1988 & Supp. IV 1992).

**2.** Id.

**3.** 26 U.S.C. § 1366(d) (1988).

of which $16.5 million is attributed to the Haseotes 25% interest. This means Haseotes' right to use his $16.5 million loss is presently suspended.[4] He is permitted to offset the $16.5 million loss against his individual income only to the extent the tax basis of his stock increases in the future.[5] Future income of the Debtor, up to $16.5 million, will pass through to Haseotes, both increasing his tax basis and being subject to offset by his $16.5 million loss.[6] The loss so freed from suspension will be treated as having been incurred by Haseotes in the same year the income is passed through to him.[7] The Debtor contends the ability of Haseotes to offset his future pass-through income against his remaining loss represents more than a tax benefit to him. This ability, it says, also brings a benefit to the Debtor. Without that offset, the stockholders of the Debtor would cause the Debtor to distribute sufficient cash to Haseotes (and the other stockholders) to enable him to pay that portion of his income tax attributable to his pass-through income. Subchapter S corporations normally make such distributions in order to avoid the disastrous situation of stockholders being taxed upon income as the result of a transaction which does not give them anything to pay the tax. The Debtor and its stockholders have gone further. With the Creditors' Committee consent and court approval, they have entered into an agreement which requires the Debtor to make quarterly distributions to the stockholders of enough funds for them to make quarterly estimated payments on the tax they incur from their pass-through income.

■ The ability to avoid having to make such distributions to Haseotes is a benefit to the Debtor which the Debtor contends is property of the estate. That benefit, the Debtor argues, would be lost if the Bank is permitted to auction the Haseotes stock to another. The ability to set off the suspended $16.5 million loss against future income is personal to Haseotes.[8]

The impact upon the Debtor would be even worse should the Bank sell the stock to a party who is not a qualified Subchapter S shareholder, such as a corporation or any entity (except certain qualified estates or trusts) that is not an individual. A sale to such an entity would end the Debtor's Subchapter S status and prevent any use of the entire $66 million suspended loss.[9]

Of relevance to the present motion are three agreements executed among the Debtor and its stockholders, all dated September 14, 1984. In one, the so-called " 'S Corporation' Agreement," the parties agree (i) the Subchapter S status of the Debtor may not be revoked without the prior written consent of shareholders holding 75% of the Class A shares, and (ii) no stock of the Debtor may be acquired by any party if the identity of the new owner or the number of resulting shareholders would terminate the Debtor's Subchapter S status. The agreement is stated to be binding upon the "Successors" of the shareholders, who are defined to include, among others, "purchasers, transferees, donees ... [and] estates in bankruptcy." The S Corporation Agreement further states "no Shares may be transferred in any manner, whether by operation of law or otherwise, [to] ... any person ... until after such person has signed and delivered to the Company and each of the Shareholders and Successors a counterpart to this agreement." The agreement places all stock certificates in escrow and prohibits the escrow agent from permitting a transfer which would violate its terms.

The other two agreements of September 14, 1984 consist of an agreement among the Debtor and the holders of its Class A shares and an agreement among the Debtor and the holders of its Class B shares. The Class A shareholder agreement prohibits any transfer of Class A stock to the Debtor or to any

4. 26 U.S.C. § 1366(d)(2) (1988).

5. 26 U.S.C. §§ 1366(d)(1), 1367 (1988).

6. Id.

7. 26 U.S.C. § 1366(d)(2) (1988).

8. 26 U.S.C. § 1366(d)(2) (1988) (suspended loss treated as loss incurred by corporation in succeeding year "with respect to that shareholder").

9. See 26 U.S.C. §§ 1361(b)(1), 1366(d)(3) (1988).

person who already owns Class A shares. It also requires, in the event of a proposed transfer to any other party, that either (i) the holders of a majority of Class A shares consent to the transfer, or (ii) the transfer take place, at a price equal to the book value of the shares, to a person (other than the Debtor or a Class A shareholder) selected by the holders of a majority of the Class A shares.

Under the agreement governing Class B shares, a party desiring to transfer his shares (except to immediate family members) must either (i) obtain consent to the transfer from the Debtor and the holders of two-thirds of the Class B shares, or (ii) first offer to sell the shares, at their book value, to the Debtor and the other Class B shareholders in a specified manner.

The Class A and Class B shareholder agreements both state they are binding upon and inure to the benefit of the Debtor and the "assigns" of the shareholders.

The Bank states the auction "will be conducted in accordance with the terms and conditions, including restrictions on transfer, of the existing shareholder agreements." [10] Referring to the Class B shares, the Bank says "the Debtor will have the right to purchase the shares at book value ... and the right will be triggered if a prospective buyer of the shares comes forward." [11] I conclude from these statements that the Bank is also willing to comply with the provisions of the Subchapter S agreement, which restricts its purchaser to a qualified Subchapter S shareholder, as well as the provisions of the Class A agreement requiring a sale of the shares at book value to a party designated by the Class A shareholders if the holders of a majority of the Class A shares do not consent to the Bank's proposed transferee. As shall be seen, however, the Bank would probably want to postpone holding the auction until the book value of the Haseotes shares in-

creases enough to cover the amount of its judgment.

## I. IS THE DEBTOR'S POTENTIAL BENEFIT FROM THE SUSPENDED HASEOTES LOSS PROPERTY OF THE BANKRUPTCY ESTATE?

■ The Bank contends the $16.5 million suspended loss is the property of Haseotes and not of the bankruptcy estate. That is true. But the Debtor does not claim ownership of the loss, only the benefit flowing to it from the ability of Haseotes to offset the loss against his future pass-through income. That ability enables the Debtor to avoid distributing cash to Haseotes so he can pay the tax he would otherwise incur. The benefit to the Debtor from the suspended loss is nevertheless contingent upon numerous future events: generation of income by the Debtor, the Debtor's continued status as a Subchapter S corporation and continuance of the Debtor's practice of paying any taxes incurred by its stockholders on their pass-through incomes. The latter event has been made more certain by the Debtor recently assuming a contractual obligation to pay the taxes, but I treat the matter as it stood when the Bank filed its motion.

■ The possibility that these contingencies will or will not occur is relevant only to the value of the Debtor's benefit from the loss. It has nothing to do with whether that benefit is property of the bankruptcy estate. I conclude that the benefit, however contingent or intangible, is property of the estate. The estate includes "all legal or equitable interest of the debtor in property as of the commencement of the case." [12] The statute says nothing about excluding intangible contingencies or expectancies. Its legislative history, moreover, indicates an intent to gather in all kinds of property interests, including the intangible and contingent. [13]

10. Bank's Reply to Debtor's Opposition, page 2.

11. *Id.*, page 3.

12. 11 U.S.C. § 541(a)(1) (1988).

13. *See* H.R.Rep. No. 595, 95th Cong., 1st Sess. 175–76, 367 (1977) ("includes all interests, such

as ... contingent interests and future interests, whether or not transferrable by the debtor"); S.Rep. No. 989, 95th Cong., 2d Sess. 82 (1978) ("includes all kinds of property, tangible or intangible"), 1978 U.S.Code Cong. & Admin.News 5787, 6136, 6323, 5868.

An analogous benefit is derived by a Subchapter C debtor from its own net operating loss carryforward ("NOL"). The case law establishes a debtor's NOL is part of its bankruptcy estate. The interest of a debtor in its own NOL was considered by the Second Circuit in *Official Committee of Unsecured Creditors v. PSS Steamship Company, Inc. (In re Prudential Lines, Inc.).*[14] The debtor, its parent and two other affiliates had filed consolidated income tax returns for a number of years. They had available for use on their consolidated 1988 tax return a combined NOL of $75 million, of which $74 million came from the debtor's prebankruptcy losses. The parent planned to take a worthless stock deduction for the debtor's stock on its 1988 return. The taking of such a deduction would have the effect of consuming the entire NOL. The parent argued the carryforward was speculative in that it depended upon the existence of future income. This, the parent said, made the case far different from *Segal v. Rochelle,*[15] where the Supreme Court included a loss carryback in an individual's debtor's bankruptcy estate.[16]

The Second Circuit in *Prudential Lines* conceded that only carryback's have a readily ascertainable value because of the known amount of past income. But it denied that the speculative nature of a tax benefit is reason to exclude it from the estate. Relying on the broad language of section 541(a)(1) and its legislative history, the court included the benefit of the carryforward in the debtor's bankruptcy estate. The court held it was property protected by both the automat-

ic stay and the permanent injunction which the bankruptcy court had entered against the parent taking the worthless stock deduction after expiration of the stay upon confirmation.[17]

To summarize, the Debtor can avoid paying Haseotes' tax on $16.5 million of future pass-through income through Haseotes being able to set off his $16.5 million suspended loss against the future income. The possibility of the Debtor having that benefit, however intangible and contingent, is property of the Debtor's bankruptcy estate. The agreement signed during this proceeding requiring the Debtor to pay its stockholders' taxes after their suspended losses are consumed merely makes the Debtor's benefit from the losses less contingent and thus more valuable. That additional benefit becomes property of the estate as an "interest in property that the estate acquires after commencement of the case."[18]

## II. IS AN AUCTION OF THE HASEOTES STOCK PROHIBITED BY THE AUTOMATIC STAY?

■ The Bank's reach and apply action is of course directed at the Haseotes stock, which is property of Haseotes and not the bankruptcy estate. The Bank has no interest in depriving the estate of the potential benefit flowing to it from the suspended loss. But this is one of those situations where a property interest of the estate and a property interest of a third party are so interwoven that the creditor's action against the third

**14.** 928 F.2d 565 (2d Cir.1991).

**15.** 382 U.S. 375, 86 S.Ct. 511, 15 L.Ed.2d 428 (1966).

**16.** In *Segal v. Rochelle,* the Supreme Court expressed concern over a question not before it— whether inclusion of a loss carryforward in an individual debtor's bankruptcy estate would be appropriate in light of the chilling effect this would have upon the debtor's fresh start. 382 U.S. at 381, 86 S.Ct. at 516. As observed in *Prudential Lines,* that consideration is not present in a corporate reorganization. In any event, Congress has reduced the effect on an individual debtor by preserving the NOL for the individual debtor to the extent it is not used by the bankruptcy estate. *See* 11 U.S.C. § 346(i)(2) (1988); 26 U.S.C. § 1398(i) (1988). There is of course

no concern about a fresh start here. Haseotes is not a debtor. And he rather than the Debtor's estate is the only party entitled to use the suspended loss; the Debtor benefits only indirectly from that use.

**17.** *See also In re Phar–Mor, Inc.,* 152 B.R. 924 (Bankr.N.D.Ohio 1993) (carryforward held property of estate and protected by both automatic stay and injunction against sale of stock causing reduction of NOL); *In re Beery,* 116 B.R. 808, 810 (D.Kan.1990) (carryforward property of estate). *But see Jump v. Manchester Life & Casualty Management Corp.,* 579 F.2d 449, 452 (8th Cir.1978) (carryforward not property of estate of liquidating corporation because value is conditional on existence of future income).

**18.** *See* 11 U.S.C. § 541(a)(7) (1988).

party's property adversely affects property of the estate. In such cases, the automatic stay protects the estate's property.[19] If the stock is sold to anyone other than Haseotes, the Debtor's benefit from the Haseotes suspended loss would terminate. That result is sufficient for the sale to be an "act ... to exercise control over property of the estate" within the meaning of section 362(a)(3).[20] A sale to a party who is not a qualified Subchapter S stockholder would end the Debtor's Subchapter S status altogether, thus dissipating the entire $66 million suspended loss of all the stockholders.

## III. DOES THE BANK LACK ADEQUATE PROTECTION?

■ There remains the ultimate question of whether there is cause, due to lack of adequate protection or otherwise, to lift the stay pursuant to section 362(d)(1). The injunction obtained by the Bank gave it a lien on the Haseotes stock.[21] The Bank obtained no lien, however, on the Debtor's benefit from the loss, the interest which is property of the estate. The Bank is nevertheless entitled to adequate protection of its lien. There is no reason that "lack of adequate protection of an interest in property" under section 362(d)(1) must relate to property of the estate. The statute is not that restrictive, and to so interpret it would invite unfair treatment of the Bank lien.[22]

The Haseotes stock may be worth no more than its book value in view of the book value price contained in the restrictions on transfer imposed by the Class A and Class B agreements, and in view also of the Bank's willingness to comply with the agreements. The Debtor's unaudited statement of September 30, 1992 shows a negative book value of $7.5 million for all its shares. The unaudited statement of April 30, 1993 indicates the Debtor's profits during the chapter 11 case have reduced the over-all negative book value to $3.2 million. Operating profits since then, plus discharge of debt at confirmation, may or may not cause the Debtor's shares to have a slight positive book value.

■ If book value is the measure, the Bank may therefore be undersecured. But the fact a creditor is undersecured is not equivalent to the creditor lacking adequate protection of its property interest.[23] A decline in the value of a creditor's security interest as a result of the stay, however, does constitute lack of adequate protection of the creditor's property interest.[24] Rather than decreasing, the book value of the Debtor's shares is increasing as the result of the Debtor's earnings. Discharge of debt on the effective date of confirmation will likely produce an additional increase in total book value of a few million dollars.[25] I therefore conclude the Bank does not lack adequate protection.

19. *In re Prudential Lines, supra; 48th Street Steakhouse, Inc. v. Rockefeller Group, Inc. (In re 48th Street Steakhouse, Inc.)*, 835 F.2d 427 (2d Cir.1987), *cert. denied*, 485 U.S. 1035, 108 S.Ct. 1596, 99 L.Ed.2d 910 (1988) (sublease of estate protected against termination of main lease which would also effect termination of estate's sublease).

20. *Official Committee of Unsecured Creditors v. PSS Steamship Company, Inc. (In re Prudential Lines, Inc.)*, 107 B.R. 832, 841–2 (Bankr.S.D.N.Y. 1989), *subsequent permanent injunction aff'd*, 119 B.R. 430 (S.D.N.Y.1990), 928 F.2d 565 (2d Cir. 1991).

21. Mass.Ann.Laws ch. 214 § 3(7) (Law Co-op. 1986); *In re Borofsky*, 138 B.R. 345, 347 (Bankr. D.Mass.1992).

22. The Bank also has a lien or mortgage covering real estate, but the value of that security interest has not been referred to by the parties.

23. *United Savings Ass'n of Texas v. Timbers of Inwood Forest Assocs. Ltd.*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988).

24. *In re Ledgemere Land Corp.*, 125 B.R. 58, 61 (Bankr.D.Mass.1991); *In re Robbins*, 119 B.R. 1, 3 (Bankr.D.Mass.1990); *In re Andrew J. Lane*, 108 B.R. 6 (Bankr.D.Mass.1989). *See also* 11 U.S.C. § 361 (to extent stay results in "decrease in the value of [creditor's] interest in ... property" adequate protection is provided by cash payment or lien in equivalent amount).

25. The Debtor has approximately $45 million of unsecured claims. Its plan pays 100% of unsecured claims over five years. But it also gives holders of unsecured claims the option to accept an immediate 60% payment in full discharge of their claims, subject to the limitation that claims of no more than $4 million are eligible for this option.

## IV. IS THERE OTHER CAUSE TO LIFT THE STAY AND PERMIT THE AUCTION?

■ Grounds for lifting the automatic stay are not limited to the creditor's lack of adequate protection. The stay may be lifted "for cause, including the lack of adequate protection of an interest in property."[26] I conclude, for several reasons, there is cause to grant the Bank relief from the stay.

It seems likely, first of all, that the restrictions on transfer of the Haseotes stock will enable the Debtor and its stockholders to arrange for Haseotes to remain the owner of the stock. The holders of Class A shares can require a sale to Haseotes by designating him as the "Selected Transferee" under their Class A shareholder agreement. He can retain ownership of his Class B shares through the Debtor exercising its first option to purchase the shares and then selling them to him. Alternatively, a waiver by the Debtor and the other stockholders of their purchase rights would permit Haseotes to purchase his Class B stock in the first instance. Thus the danger of the Debtor losing its benefit from the Haseotes $16.5 million suspended loss seems more apparent than real because of the Bank's willingness to comply with these sale restrictions. I do not decide whether they are otherwise binding on the Bank.

Other factors favor the Bank. This case involves considerations which are similar to those presented when a debtor requests the court to exercise its section 105 injunctive powers to enjoin action against its stockholder on the stockholder's guaranty of a debt of the debtor. Courts are generally willing to grant the injunction only if the action poses a serious threat to the pending reorganization and there will be no irreparable prejudice to the creditor.[27] The Bank's action against Haseotes poses no serious threat to the Debtor's reorganization. As discussed below, I have already confirmed the Debtor's plan. And, in view of the Debtor's resources, it may be feasible for the Debtor to loan

Haseotes the money to pay the Bank in order to preserve the Debtor's benefit from the loss.

The present case, moreover, is different from *Prudential Lines.* In that case, the party threatening to consume the estate's property interest was the debtor's sole stockholder. As noted by the bankruptcy court, it was appropriate that the debtor's creditors have the benefit of the NOL because the losses giving rise to the NOL were the reason creditors had not been paid.[28] The court also believed permitting a stockholder to deprive creditors of the NOL runs contrary to the policy favoring priority of creditors over stockholders in bankruptcy.[29] In the present case, the party competing with the estate and its creditor beneficiaries is a creditor itself.

## V. SHOULD THE COURT EXERCISE ITS SECTION 105 INJUNCTIVE POWERS UPON TERMINATION OF THE STAY?

■ Issues concerning the automatic stay will soon become moot. Since the filing of the Bank's motion, I have confirmed the Debtor's plan of reorganization. The effective date of confirmation has been delayed by the necessity for counsel to draft certain documents, but it will soon take place. Except as otherwise provided in a plan, or in the order of confirmation, confirmation of a plan, when effective, vests all property of the estate in the reorganized debtor.[30] Neither the Debtor's plan nor the confirmation order of October 22, 1993 contains any provision retaining the Debtor's benefit from the loss in the estate. Nor would such a provision make any sense. Indeed, section 8.2 of the plan confirms the general transfer of property from the bankruptcy estate to the reorganized debtor. The automatic stay with respect to an act against property of the estate terminates when the property leaves the es-

26. 11 U.S.C. § 362(d)(1) (1988).

27. *See, e.g., Apollo Molded Products, Inc. v. Kleinman (In re Apollo Molded Products, Inc.),* 83 B.R. 189 (Bankr.D.Mass.1988).

28. *Prudential Lines,* 107 B.R. at 838.

29. *Id.*

30. 11 U.S.C. § 1141(b) (1988).

**70**

tate.[31] Should the Bank's law suit be considered an act against the Debtor, the stay against this act will also soon expire. The stay of any act other than an act against property of the estate terminates at the time the debtor is granted a discharge. That will also occur on the effective date of confirmation.[32]

The court is nevertheless empowered to enjoin the Bank's action pursuant to the court's general equitable power to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." [33] In *Prudential Lines*, the Second Circuit approved the issuance of a permanent injunction under section 105(a) following confirmation of the plan and expiration of the stay.

I decline to issue such an injunction. The Bank's action presents no obstacle to this reorganization which outweighs the legitimate right of the Bank to be paid.

A separate order has issued.

---

31. 11 U.S.C. § 362(c)(1).

32. 11 U.S.C. § 1141(d)(1) (1988).

33. *See* 11 U.S.C. § 105(a) (1988).